UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| THE UNITED STATES OF AMERICA; and THE STATE OF RHODE ISLAND *ex rel.* SARA QUARESMA and MICHAEL DELMONICO, <br><br> Plaintiffs and Relators, <br><br> v. <br><br> THE JOURNEY TO HOPE, HEALTH and HEALING, INC., and KENNETH L. RICHARDSON, JR., <br><br> Defendants. | Civil Action No. 20-CV-0451-JJM-LDA <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730** |

## COMPLAINT IN INTERVENTION

The United States of America ("United States"), by and through its attorney, Zachary A. Cunha, and the State of Rhode Island ("Rhode Island"), by and through its attorney, Peter F. Nehrona, allege the following:

## INTRODUCTION

1.      The United States and Rhode Island bring this action against Defendants pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA") and the Rhode Island False Claims Act, R.I.G.L. § 9-1.1-1, *et seq.*, ("RI FCA") seeking treble damages and civil penalties, and under common law and equitable theories of recovery.

2.      From 2015 to 2021, The Journey To Hope, Health and Healing, Inc., ("Journey") and its CEO, Kenneth L. Richardson, Jr., ("Richardson") billed Rhode Island Medicaid multiple millions of dollars for substance use disorder treatment services that the Defendants knowingly and routinely failed to provide to the patients who needed these

1

services.

3.      Specifically, these Defendants knowingly held themselves out as a certified and accredited opioid treatment provider, subject to specific federal and state requirements, including that they provide individualized treatment plans and adequate rehabilitative counseling services for patients, when, in fact, they were routinely failing to provide treatment plans and adequate counseling for patients for whom they were providing methadone.

4.      In numerous instances, Medicaid beneficiaries were receiving methadone from Journey for years without any required individualized treatment plan in place. When patients did have treatment plans, Defendants often failed to update those plans for years.

5.      Many Medicaid beneficiaries at Journey continued to test positive for illicit substances, including fentanyl, while receiving methadone at Journey, without any increased services or attention.

6.      Counselors assigned to provide counseling to patients were so overwhelmed by their caseloads, which at times exceeded 100 patients, that it was physically impossible to offer the required counseling and updated individualized treatment plans.

7.      Yet Journey continued to knowingly bill the government for "bundled" medication-assisted treatment services, falsely claiming that they were meeting all the requirements of an opioid treatment provider and falsely claiming that they were providing all required services in order to seek payment.

8.      Recognizing that patient files would show Journey's failure to provide the services it claimed, in anticipation of audits by accreditation officials and by the Rhode Island Executive Office of Health and Human Services, Journey management repeatedly directed employees to create and backdate documents in order to make it appear that

updated individualized treatment plans were in place and that the required counseling sessions were occurring when, in fact, they were not.

9.      Multiple employees followed these instructions, creating false records in order to support Journey's continued billing.

10.     The failure of the Defendants to provide individualized treatment plans and offer the required counseling services was brought to the attention of CEO Richardson, but the Defendants' conduct continued.

11.     Former employees warned Richardson that staffing levels were too low to possibly provide the services required and that the patient files needed to be fixed in preparation for upcoming audits by the State because those files did not contain required treatment plans, among other deficiencies.

12.     In addition, when at least one former employee raised concerns with Richardson about Journey's practices, Richardson instructed the employee not to report this information to State authorities.

13.     From January 2015 to July 2021, Journey received over $15 million in payments from Rhode Island Medicaid, funded by the federal government, for bundled methadone treatment services. Over half of these claims were for patients who were not receiving required services.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1367(a).

15.     The Court may exercise personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because each Defendant resided and/or transacted business in the District of Rhode Island during the relevant time period.

16.        Venue is proper in the District of Rhode Island under 31 U.S.C. § 3732 and

28 U.S.C. § 1391(b), because Defendants transact or transacted business in this District and

a substantial part of the events giving rise to this action occurred in this District.

## PARTIES

17.        Plaintiff, the United States, acting through the Department of Health and

Human Services ("HHS"), administers Grants to States for Medical Assistance Programs

pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, ("Medicaid").

18.        Plaintiff, Rhode Island, acting through the Executive Office of Health and

Human Services ("EOHHS"), administers the Rhode Island Medicaid program, established

pursuant to R.I. Gen. L. Chapters 40-8, 42-7.2 and administrative regulations set forth in

210 R.I. Code R. § 20-00-1.5.

19.        Relators Sara Quaresma and Michael DelMonico are former employees of

Journey.

20.        Defendant Journey was a Rhode Island corporation with its corporate office

located at 985 Plainfield Street, Johnston, RI 02919. Journey operated four outpatient drug

treatment centers in Rhode Island.

21.        Defendant Richardson was the CEO of Journey at all relevant times.

## LEGAL BACKGROUND

## I.  THE FALSE CLAIMS ACT AND RHODE ISLAND FALSE CLAIMS ACT

22.        The FCA and RI FCA prohibit knowingly presenting, or causing to be

presented, false or fraudulent claims for payment to the government and knowingly making,

using, or causing to be made or used, false records or statements material to false or

fraudulent claims paid by the government.

23.        The FCA provides, in pertinent part, that any person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

(a)(1)(C) conspires to commit a violation of subparagraph (A) [or] (B)…

is liable to the United States for three times the amount of damages which the government sustains, plus a civil penalty per violation. *See also* R.I.G.L. § 9-1.1-3 (containing identical provisions).

24.      For violations occurring between September 28, 1999, and November 2, 2015, the FCA provides civil penalty amounts that range from a minimum of $5,500 to a maximum of $11,000 per claim. *See* 28 C.F.R. § 85.3(a)(9) (1999). For violations occurring after November 2, 2015, the civil penalty amounts range from a minimum of $13,508 to a maximum of $27,018 per claim. *See* 28 C.F.R. § 85.5; R.I.G.L. § 9-1.1-3(a)(7).

25.      For purposes of the FCA and RI FCA, the terms "knowing" and "knowingly" (A) mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1); R.I.G.L. § 9-1.1-3(b)(2).

26.      The FCA and RI FCA define "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4); R.I.G.L. § 9-1.1-3(b)(3).

II. <u>THE MEDICAID PROGRAM</u>

27.      In 1965, Congress created the Medicare and Medicaid programs to pay for the costs of certain health care services. *See* 42 U.S.C. § 1395, *et seq*; 42 U.S.C. §§ 1396 *et seq.* HHS, through the Centers for Medicare & Medicaid Services ("CMS"), is responsible for

administering and supervising the Medicaid program at the federal level.

28.       Medicaid is a joint federal-state program that provides health care benefits for certain groups, including the poor and disabled. The state of Rhode Island implements the Rhode Island Medicaid program pursuant to a state plan approved under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq*.

29.       Medicaid in the State of Rhode Island is administered by the Rhode Island Executive Office of Health and Human Services ("EOHHS").

30.       Within broad federal rules, Rhode Island Medicaid decides eligibility, the services covered, payment levels for services, and administrative and operational procedures. Rhode Island Medicaid directly pays providers and obtains the federal share of the payment from United States Treasury funds. The federal share is known as the Federal Medical Assistance Percentage ("FMAP"). During all times relevant to this Complaint, the United States provided funds to the State of Rhode Island through the Medicaid Program.

31.       Enrolled healthcare providers for Rhode Island Medicaid beneficiaries are eligible for reimbursement for covered services under the provisions of the State of Rhode Island Medicaid statute, R.I. Gen. L. Chapters 40-8, 42-7.2, and administrative regulations set forth in 210 R.I. Code R. § 20-00-1.5.

32.       Under 210 R.I. Code R. § 20-00-1.5, all Rhode Island Medicaid providers are required to comply with all federal and Rhode Island statutes and regulations pertaining to Rhode Island Medicaid.

33.       Under 210 R.I. Code R. § 20-00-1.5, sanctions may be imposed against any Rhode Island Medicaid provider who presents, or causes to be presented for payment any false or fraudulent claim for medical services; who fails to provide and maintain quality services to Medicaid recipients within accepted medical community standards; who

breaches the terms of a Medicaid provider agreement or fails to comply with the terms of the provider certification of the Medicaid claim form; who violates any provisions of applicable federal and state laws; who submits false or fraudulent information in order to obtain provider status; who fails to meet standards required by state or federal laws for participation such as licensure or certification; and/or who fails to comply with all applicable standards set forth in the Medicaid Provider Manuals.

34.     To participate in the Rhode Island Medicaid program as a new enrollee, medical providers must apply through EOHHS, which includes the submission of a Provider Agreement.

35.     The Provider Agreement requires, among other things, signatories to certify:

> The Provider acknowledges it is subject to and will follow all applicable Federal and RI General laws, EOHHS rules, applicable State and Federal regulations, the False Claims Act, Title XIX of the Social Security Act…EOHHS policies and amendments, official policy as transmitted to the provider in the applicable EOHHS provider manuals, provider bulletins, reference guides, transmittal letters or "updates" as well as certification standards that govern…the Rhode Island Medicaid Program in accordance with requirements of the Federal Government and the State of Rhode Island and any amendments to any of these authorities thereto….**The provider acknowledges that it is responsible for knowing the applicable provisions of federal and state laws, regulations, the Medicaid waiver requirements, and policies that apply to the provided services and for complying with all as a condition of participation as a provider in the RI Medicaid program**. Provider may be held liable for any violation of these rules, regulations or policies including suspension and/or termination from the RI Medicaid program. Provider acknowledges that administrative, civil, or criminal action may be initiated if the Provider is found in violation of the legal authorities. It is the responsibility of the provider to be familiar with the legal authorities.
>
> ***
>
> Provider agrees that it will practice sound fiscal business practices including but not limited to **refraining from billing for services which are not documented**; failing to meet the minimal professional standards for such services; or failing to meet the required billing elements for that service as required by the RI Medicaid program.

***

**To provide medically necessary services, goods, or products within the amount, duration, and scope of RI Medicaid, to beneficiaries consistent with the provider's qualifications** and adhere to professional standards governing medical care and services.

***

On each claim form or transmittal document for the claims submitted via electronic means, **to certify by signature of the provider…that the goods or services listed were** medically necessary…and **actually rendered to the RI Medicaid beneficiary**. The Provider shall be responsible for the accuracy of claims submitted, whether in paper or electronic form.

***

This is to certify that the information provided in support of the Provider Application is true and accurate and I completely understand that any falsification or concealment of a material fact may be prosecuted under Federal and State Laws. Willful misstatement of any material fact in the application may result in criminal prosecution. I acknowledge that this agreement is being signed under the pains and penalties of perjury and understand that EOHHS is relying on the accuracy of the information I have presented. **I understand and accept that my signature herein denotes acceptance of the terms of this agreement, which are binding upon all of my employees, contractors, agents and representatives**. I agree to inform and educate all my employees, contractors, subcontractors, agents and representatives of the requirements of this agreement.

*See* https://eohhs.ri.gov/sites/g/files/xkgbur226/files/2022-05/Provider%20Agreement%20with%20signature.pdf, (last visited April 13, 2023) (emphasis added).

36.     The provider, chief corporate officer, or authorized agent must sign the Provider Agreement. *Id.*

III. OPIOID TREATMENT PROGRAMS

37.     Methadone is medication approved for the treatment of opioid use disorder.

38.     Under federal law, methadone can only be administered by an Opioid Treatment Program ("OTP") that is the subject of a current, valid certification from the

Substance Abuse and Mental Health Services Administration ("SAMHSA"). 42 C.F.R. § 8.11. In order to obtain certification, an OTP must meet the federal opioid treatment standards listed in 42 C.F.R. § 8.12 and must be the subject of a current, valid accreditation by an accreditation body. *Id.*

39.     Accreditation is a peer-review process that evaluates an OTP against SAMHSA's opioid treatment standards and the accreditation standards of SAMHSA-approved accrediting bodies.

40.     One organization that provides the required SAMHSA-approved accreditation that OTPs need in order to administer methadone is the Commission on Accreditation of Rehabilitation Facilities ("CARF").

41.     OTPs operating in Rhode Island must also be licensed by the Department of Behavioral Health, Developmental Disabilities and Hospitals ("DBHDH") and must comply with DBHDH rules and regulations and other state laws regarding drug treatment. 212 RI ADC 10-10-1. DBHDH regulations specifically include the delivery of Medication Assisted Treatment ("MAT") rendered by OTPs. 212 RI ADC 10-10-1.6.14.

42.     Federal law provides that OTPs must "provide treatment in accordance with the standards in [42 C.F.R. § 8.12] and must comply with these standards as a condition of certification." 42 C.F.R. § 8.12(a). These standards include that "OTPs shall provide adequate medical, counseling, vocational, educational, and other assessment and treatment services." 41 C.F.R. § 8.12(f).

43.     Under federal law, OTPs are required to prepare an initial treatment plan for each patient that includes the patient's short-term goals, the tasks the patient must perform to complete these goals, the patient's requirements for education, vocational rehabilitation, and employment, and the medical, psychosocial, economic, legal or other supportive

services that a patient needs. 42 C.F.R. § 8.12(f)(4). This plan must be reviewed and updated to reflect the patient's personal history, his or her current needs for medical, social, and psychological services, and his or her current needs for education, vocational rehabilitation, and employment services. *Id*.

44.     OTPs are further required to provide adequate substance abuse counseling to each patient, 42 C.F.R. § 8.12(f)(5), and to establish and maintain a recordkeeping system that is adequate to document and monitor patient care, 42 C.F.R. § 8.12(g).

45.     Rhode Island regulations require that OTPs do the following:

    A.  develop and implement an individualized, person-centered treatment plan for each patient, both initially and annually, which includes the unique needs, expectations, and characteristics of the person served and an appropriate, personalized, and comprehensive plan;

    B.  review, revise and update these plans at least every six months;

    C.  provide adequate rehabilitative counseling services, including a minimum of one session of counseling per month; and

    D.  have clinical staff caseloads that do not exceed an average staff to client ratio of 1:60.

    212 RICR 10-10-1.6.3-4; 1.6.14.

46.     Prior to December 27, 2022, Rhode Island regulations required that patients be offered one hour of counseling per month, or, if participating in group therapy, one hour of counseling every 90 days.

47.     In order to bill health care benefit programs, including Rhode Island Medicaid, providers use a Healthcare Common Procedure Coding System ("HCPCS") code, which are standard codes that represent medical procedures, supplies, products and services

and are represented by a letter followed by four numeric digits.  Most medical procedures

have their own HCPCS code and Rhode Island Medicaid pays a specified amount of money

for each HCPCS code billed.

48.     When an OTP provides the required services under all applicable laws, it may

use a bundled HCPCS code, H0020, to bill Rhode Island Medicaid on a weekly basis for

patients who are receiving methadone as well as the other required services, including

updated treatment plans, counseling, and urine drug screens.

49.     By submitting a claim to Rhode Island Medicaid using HCPCS code H0020,

the OTP certifies that it meets the requirements to bill as an OTP and that a qualified

provider has provided the MAT services for which it is billing, which were medically

indicated and necessary for the health of the patient.

## DEFENDANTS' FRAUDULENT SCHEME

IV. JOURNEY BILLED FOR MEDICATION ASSISTED TREATMENT IT DID NOT
    PROVIDE

50.     Journey is an outpatient treatment provider that provides drug and alcohol

treatment, including mental health services, to recovering alcohol and drug addicted

persons, operating centers in Providence, Johnston, Middletown, and Westerly, Rhode

Island. Journey provides MAT that includes Methadone and Suboxone.

51.     At all relevant times, Journey was certified as an OTP and was enrolled as a

Medicaid provider.

52.     Using HCPCS code H0020, Journey billed Rhode Island Medicaid weekly for

patients to whom it certifies that it has provided bundled MAT services.

53.     By enrolling in Rhode Island Medicaid and submitting claims for payment for

bundled MAT services, Journey represented that it met all applicable OTP requirements,

and provides all required services under state and federal law.

    A.  <u>Journey Failed To Provide Patients with Individualized Treatment Plans</u>

54.      Between January 2015 and July 2021, Journey routinely billed Rhode Island Medicaid for bundled MAT services while failing to meet the federal and state requirements to do so.

55.      Among other things, Journey regularly provided patients with methadone without providing patients with updated individualized treatment plans.

56.      As admitted in testimony under oath by D.C., the former executive director at Journey, a treatment plan is both required by the applicable regulations, and is "like a map with the steps [the patients] are going to take to get somewhere…it's a very important document." This former executive director also described the treatment plans being used at the beginning of her time at Journey as "cookie cutter, meaning everyone had the same [plan]." She further testified that this was "absolutely not" appropriate, as treatment plans needed to be "based on that person."

57.      As a former counselor at Journey explained, "with no treatment plan, there is no plan of care to address continued use, it just continues a patient's free-fall into substance abuse."

58.      Nonetheless, as acknowledged by multiple former Journey employees, it was a common problem for patients to be missing treatment plans altogether in their patient files, or for their treatment plans to be badly outdated.

59.      A former supervisor at the Johnston location estimated that by 2019, 50-60% of patients did not have updated treatment plans, and counselors were creating and backdating treatment plans in patient files in an effort to retroactively improve the appearance of the patient files.

60.      A former counselor at the Johnston location stated that when s/he started counseling at Journey in early 2020, over half of the counselor's assigned patients had no treatment plans at all, including patients who had been at Journey for several years.

61.      A former counselor at the Westerly location stated that most, if not all, patient files were incomplete, and at one point the counselor took over the care of a patient who had been at Journey for three years with no treatment plan.

62.      A former supervisor at the Westerly location estimated that 50% of patients did not have updated treatment plans.

63.      A former counselor at Journey recalled that as a new counselor, most of the counselor's patients did not have updated treatment plans, so the counselor was not sure what s/he was treating the patients for.

64.      A review of a statistically valid random sample of patient files from Journey showed that nearly half of the claims Journey submitted for payment from January 2015 to July 2021 for bundled MAT services under HCPCS code H0020 were for patients who did not have updated treatment plans in place at the time.

B.  Journey Employees Falsified Records To Make it Appear that Patients Were Receiving Required Substance Abuse Counseling

65.      Journey also failed to provide many patients with adequate counseling services, but nonetheless documented and billed as if it were routinely providing one hour of counseling to the patients.

66.      As noted above, at all relevant times, OTPs were required by 42 C.F.R. § 8.12(f)(5), to provide adequate substance abuse counseling to each patient, and Rhode Island regulations required that as part of these services, patients be offered one hour of counseling per month, or, if participating in group therapy, one hour of counseling every 90

days.  212 RICR 10-10-1.6.1.14(A)(5)(d).

67.      Counselors at Journey carried caseloads that made it impossible to offer meaningful substance abuse counseling to Journey patients.

68.      Multiple counselors at Journey had caseloads of 90-100 patients.

69.      Nonetheless, the former executive director, D.C., and M.D., a clinical supervisor, instructed counselors to submit counseling notes indicating that an hour of counseling had been provided to each patient every month, even if that counseling had not been provided.

70.      In fact, at times, it was not mathematically possible to counsel each patient for the amount of time the counselors were instructed to record in their notes.

71.      Various former counselors and counseling supervisors for Journey confirmed that Journey did not provide the required, and billed for, counseling services.

72.      A former counselor at the Johnston location characterized Journey as wanting the maximum number of clients while providing the minimum amount of services. This counselor stated that s/he saw patient files where the patient had not received any counseling services for seven months.

73.      A former counselor at the Providence location stated that instead of sitting down with patients for counseling sessions, the counselor would sometimes meet a patient in the parking lot for 10 minutes, and the counselor was instructed by D.C. to write a note indicating that the encounter was for an hour.

74.      A former counselor at the Westerly location stated that because the counselor's understanding was that s/he would lose their job if s/he did not record an hour of counseling for each patient, the counselor would document an hour of counseling time, even if it had not occurred.

75.      A former supervisor at the Westerly location testified that the number of patients that needed to be seen was "astronomical," and it was "understood" at Journey that patients were not being seen for an hour but that an hour of counseling was being documented. The supervisor testified that M.D. instructed counselors at the end of each month to call patients who had not been seen and document that an hour of counseling had taken place, even if it had not.

76.      A former counselor at the Middletown location was told by Journey management that it was acceptable to meet with patients for 5-10 minutes and document one hour of counseling.

    C.  Journey Falsified Records in Preparation for Multiple Audits To Make it Appear
        that Patients Had Been Provided with Treatment Plans and Adequate Counseling

77.      In the fall of 2019, Journey was audited by CARF, an organization that provided the accreditation for Journey as an OTP.

78.      Journey was required to maintain accreditation in order to continue to operate as an OTP and to bill Medicaid for its services.

79.      Richardson tasked D.C. with assisting Journey with the CARF audit.

80.      In preparation for the CARF audit, multiple Journey employees were instructed by management, including D.C. and M.D., to "fix" patient files by creating and backdating treatment plans to make it appear as though treatment plans had been in place for Journey patients.

81.      As former employees have admitted, in preparation for CARF, multiple Journey counselors created backdated treatment plans, including by copying treatment plans from one patient to another or creating the plans for several years from scratch without ever seeing the patient.

15

82.    A former employee at the Westerly location stated that if employees did not agree to backdate documents, they were fired or bullied by Journey management.

83.    In an email dated July 22, 2019, M.D., a clinical supervisor, wrote to three Journey employees

"This is a reminder of the 20 charts that will need to be updated since **5/31/2017**. The following will need Annual Bio's, possibly 5 yr Bio's when necessary, Individualized Treatment Plan, Transition Plan, MPL, and Discharge summary for Discharged client…This list has got to be priority."

(emphasis added)

84.    In another email dated September 12, 2019, with the subject "Carf Charts," M.D. wrote to two counselors: "…please let me know which charts you both will be doing for this CARF process so we can began [sic] a review Monday. This has to be completed by 9/27/19 so we can review and update other portions of the chart…"

85.    In response, one of the counselors, wrote, "[M.D.]: Can you please go over what needs to be done for these charts with me? None of these clients are on my caseload but I can help out."

86.    M.D. responded, "Yes, **from May 2017 – present**. All clinical paperwork up to date. Bios, Treatment Plans, Transition Plans, MPL updated, and PHQ-0 for all clients as of 7/1/19. I have not reviewed a successful chart yet in Westerly." (emphasis added)

87.    In response, the counselor created and backdated treatment plans in preparation for the CARF audit. In some instances, this counselor, at the direction of M.D., signed and dated treatment plans with dates prior to when s/he began working at Journey.

88.    In another email dated September 28, 2019, D.C. sent a typed treatment plan to three Journey employees for Patient 160. The treatment plan stated, "valid from 2/19 to

8/19." The patient's signature line was blank, but the date 3/22/19 was pre-typed into the plan. The clinician's name was typed into the plan, also next to the date 3/22/19.  D.C. wrote in the email "Please have pt review and sign tx plan and tx review."

89.     The treatment plan for Patient 160 in the patient file includes the typewritten document that was backdated and sent by D.C. in September of 2019, with a signature next to the clinician's name and the pre-typed date of 3/22/19. This clinician was not employed by Journey in September 2019.

90.     The treatment plan for Patient 160 in the patient file also includes the patient's signature next to the pre-typed date. With respect to this document, D.C. was questioned and testified as follows:

"Q. So Journey was asking a patient to backdate their treatment plan to make it look like there was a valid treatment plan starting March 22, 2019, when there was not one in place at that time; is that correct?

A. Correct."

91.     In October of 2019, EOHHS conducted an additional audit of Journey, and requested medical records for specific patients from April 1, 2018, to June 30, 2019.

92.     On November 4, 2019, D.C. sent an email to the staff at the Johnston Journey location, copying supervisor M.D., requesting treatment plans for a specific list of patients for the time period requested by EOHHS.

93.     In response, a counselor at the Johnston location provided treatment plans for Patient 307, dated December 2017 through June 2019.

94.     This employee has admitted that s/he created these treatment plans in response to D.C.'s request without ever seeing the patient.

95.     The falsification of records for future audits continued in 2020.

96.        On August 26, 2020, a counselor at Journey sent an email to D.C. with a list of 16 patients whose treatment plans were "due," stating, "[a]ll are overdue. Some by years. Out of my 52 patients, about half need treatment plans for 2020."

97.        A former counselor at the Middletown location recalls being instructed by management to complete and backdate missing patient assessments in 2019 and 2020, and that D.C. instructed the counselor to use old forms to make it look like the documents were being completed on the date listed on the document. The counselor recalls generating an excuse for the patient to sign and backdate the documents. This counselor also recalls there being a patient who had received no counseling from January to October of 2019, but the counselor was instructed to backdate counseling notes for the file.

98.        Upon review of multiple counseling notes with the counselor's name from 2020, a former counselor at the Providence location stated that s/he did not sign the notes, and that the signature on the notes was not actually the counselor's signature.

99.        A counselor in Westerly was instructed by their supervisor to document one hour of counseling per month, and as a result, the counselor identified over 40 individual counseling notes that s/he had signed indicating that 60 minutes of counseling had taken place when they did not in fact meet with the patient for 60 minutes.

100.        Journey records indicate that M.D. entered 40 nearly-identical counseling notes, dated between March 23, 2020 and March 30, 2020, indicating that 60 minutes of counseling had been provided to patients, even though an hour of counseling had not been provided. In each note, the text includes that the patient "mentioned boredom as a trigger" and that the patient reported "coping by keeping [his/her] mind busy with watching shows on television and cleaning [his/her] living space."

## V.  PATIENTS SUFFERED AS A RESULT OF JOURNEY'S CONDUCT

101.    Defendants' conduct not only resulted in billings to Rhode Island Medicaid for services that were not provided, but it also deprived patients of critical services that they needed as part of their recovery process.

102.    As one former counselor at Journey explained, Journey patients were "exploited" and the culture at Journey was tricking people into thinking that services were being provided when actually very little was being done on behalf of patients.

103.    One former supervisor at Journey admitted under oath that she was worried that as a result of Journey's conduct, people were going to die.

### A.  Patient 1180

104.    Journey records indicate that Patient 1180 was a patient at the Johnston location from April 2017 to June 2021. There is no treatment plan in Patient 1180's file.

105.    Patient 1180's patient file indicates that s/he tested positive for either fentanyl or cocaine every single time he was tested, and in June of 2021, s/he was admitted to Butler hospital.

106.    In spite of never creating a treatment plan for Patient 1180, from April 2017 to June 2021, Journey submitted 241 claims for bundled MAT services using HCPCS code H0020 for Patient 1180, and the government paid $18,146.90 to Journey for their treatment.

### B.  Patient 743

107.    Journey records indicate that Patient 743 was a patient at the Westerly location beginning in at least July 2016. S/he had been discharged from a different opioid-treatment clinic due to the use of benzodiazepine during treatment.

108.    The initial treatment plan for Patient 743 is dated July 2016, with another plan dated October 2016.

109.    After October 2016, the next treatment plan is dated August 6, 2019, and was signed by a counselor who was not employed at Journey on that date. The counselor who signed this treatment plan confirmed that M.D. gave the counselor the plan and instructed the counselor to backdate it.

110.    On May 12, 2020, D.C. sent staff from all four Journey locations an email stating, "As you are aware I have been staying on all of you about the treatment plans…We have an open complain [sic] with the state in regards to the above items. I need to know today where everyone stands, **the truth**." (emphasis in original)

111.    In response, the counselor who created Patient 743's treatment plan stated that she had 28 treatment plans for 2019 and 12 treatment plans for 2020 left to do.

112.    S/he wrote, "A lot of patients that were just put on my caseload had nothing done for two years…"

113.    Patient 743 has another treatment plan in their file signed by this counselor, dated February 2020.

114.    One of Patient 743's counselors testified that not having a treatment plan is a serious concern and that without a treatment plan, s/he would not have been able to provide effective counseling to Patient 743. The counselor stated: "There's no goals…[W]hat do you document in a progress note if you don't know what you're working on?"

115.    From July 2016 to October 2020, Patient 743 underwent nearly 80 urine drug screens, of which over half were positive for benzodiazepine, cocaine, or amphetamines, or a combination.

C.    Patient 1167

116.    Journey records indicate that Patient 1167 was a patient at the Providence location beginning in September 2014.

20

117.     Patient 1167 had numerous positive tests for illicit substances while receiving methadone doses at Journey.

118.     Patient 1167's patient file includes a treatment plan dated September 2014 that was signed by an employee who was not employed by Journey in 2014.

119.     The next treatment plan in Patient 1167's file is dated March 11, 2019, over four years after Patient 1167 began treatment.

120.     Journey submitted 354 claims ($29,069.36) for bundled MAT services using HCPCS code H0020 for Patient 1167. Of these claims, 229 claims ($18,075.50) were paid for months where there was no updated treatment plan for Patient 1167.

    D.  Patient 1618

121.     Journey records indicate that Patient 1618 was a patient at the Providence location at least from February 2016 to April 2022.

122.     There is no treatment plan in Patient 1618's patient file until a plan that purports to be dated December 3, 2020, over four years after s/he began treatment. However, Patient 1618 was not receiving methadone doses in Providence in December 2020, there are no drug screen tests indicating that s/he was present at the Providence location in December 2020, and there are no notes in their patient file from July 2020 through February 2021.

123.     The first treatment plan in Patient 1618's patient file during the time when s/he was actually present at the Providence clinic is dated March 25, 2022, over 6 years after s/he began treatment at Journey.

124.     From February 2016 to July 2021, in spite of the fact that Journey had no legitimate treatment plan in place for Patient 1618, Journey submitted 281 claims for bundled MAT services for Patient 1618, and the government paid $23,663.80 for their treatment.

VI. JOURNEY LEADERSHIP KNEW PATIENTS DID NOT HAVE TREATMENT PLANS AND DID NOT RECEIVE REQUIRED COUNSELING SERVICES

125.    Richardson was informed by multiple employees that patient files did not have treatment plans and that patients were not receiving adequate and required counseling services.

126.    For example, the former executive director, D.C., testified that she discussed the situation at all the clinics with Richardson, stating, "there were not enough staff members so there was no documentation or quality of work. There couldn't have been considering the amount of patients versus the amount of staff members and the no training that they received and no one looking at these charts to even know this exists."

127.    D.C. also testified, "I said [to Richardson], 'You have so many people, patients, and you have so many staff, it's not working out. We have to hire people because they don't get what they need. They don't get what they need as services."

128.    On December 29, 2018, Journey's CFO sent an email to Richardson stating, "I am so nervous, our Counselors are not trained. I tested Britni for the month of December…Here is my summary, 1. 11 patients – counseled for an hour – same note typed for all patients 2. 35 patients, no time listed and same note typed for all patients 3. 34 patients, NOT seen at all."

129.    Every month, Richardson received a report showing how many patients had been seen by their counselors and how many had not.

130.    Emails between staff and Richardson also reflect his understanding that the necessary records and treatment plans did not exist and that records were being created just prior to the audit.

131.    For example, on July 7, 2019, D.C. sent an email to Richardson and the CFO,

with the subject "audit." D.C. wrote, "By the grace of God, [], is there any possibility that we reschedule for September with the state?" She further wrote, "Middletown has almost nothing that is needed…WE can fix many things, but the patient records…OMG!!! Wrong and missing forms…needs re-done from scratch." She further wrote, "I am talking about the state audit. As we fix and get ready for state and it will help very much for the surveys."

132.    Richardson wrote back and acknowledged that he wanted to conceal this situation from the state audit, stating: "I can ask, but the state may get suspicious since I asked already. Is it possible to put a team together and pay overtime to get it done when scheduled…"

133.    On July 24, 2019, D.C. sent another email to Richardson about the absence of records and questioning whether the counseling even occurred. It stated, "I am writing to let you know that as I continue to work on Middletown charts and I am discovering how deep the problems are there. I don't understand how any counselor can see a patient in monthly session, if that even happens, and not notice that there is no assessment, no treatment, or anything…and how we can do sessions without these important documents…On top of this, many patients are positive fentanyl and cocaine and no extra help given, no medical intervention…"

134.    In response, a counselor wrote, copying Richardson, "If you think it looks bad now than you should have seen it before. More than half the clients had no intake packets at all…"

135.    On July 25, 2019, Richardson sent an email to D.C. acknowledging that they were not sufficiently staffed. He stated: "we really need to get counseling staff increased as I fear the State will tell us to stop doing intakes until we do. They already mentioned it a few weeks ago during their investigation."

136.    On October 15, 2019, clinical supervisor M.D. sent an email to several employees, as well as Richardson and the CFO, which stated, "I understand everyone's frustrations, as I too have been overwhelmed with floating between two clinics with a total census of over 700 clients…CARF Charts have been the worst in Johnson, no matter what gets reviewed or updated with clinicians, as far as needing Bios, Tx Plans, MPL's Patient Rights, etc., only a few have been completed, less than 4 complete charts in fact as we go into the final week before CARF comes."

137.    In or about May of 2020, one counselor told Richardson about the fraudulent conduct at Journey, and Richardson instructed the counselor not to speak to anyone from the State.

VII.    JOURNEY SUBMITTED FALSE CLAIMS TO THE GOVERNMENT

138.    A review of a statistically valid random sample ("SVRS") of patient files from January 2015 to July 2021 for patients at Journey indicated that over half of the claims submitted to Rhode Island Medicaid for payment using code H0020 were for patients for whom the patient file did not contain updated treatment plans or records of adequate counseling services during the time period that was billed. During that time period, Journey submitted tens of thousands of claims for these services.

139.    The SVRS, reviewed by the government, was extrapolated and it is estimated that from January 2015 to July 2021, Journey received over $7,750,000 in Medicaid overpayments for services provided to patients who did not have an updated treatment plan or records of adequate counseling services.

140.    Journey's submission of claims to Rhode Island Medicaid using the HCPCS code H0020, indicating that it was providing all required OTP services to Journey's patients, including updated individualized treatment plans and counseling services, was material to

Rhode Island Medicaid's decision to pay Journey's claims and to the United States' participation in the payment of Journey's claims.

141.    Journey's provision of records to auditors indicating that services had been provided to patients was material to Rhode Island Medicaid's decision to pay Journey's claims and to the United States' participation in the payment of Journey's claims.

142.    Journey's continued accreditation by CARF was material to Rhode Island Medicaid's decision to pay Journey's claims and to the United States' participation in the payment of Journey's claims.

143.    Richardson and Journey had actual knowledge, reckless disregard, or deliberate ignorance of the fact that Journey was not providing patients with updated treatment plans and was not providing the required amount of counseling services to patients.

144.    Richardson and Journey had actual knowledge, reckless disregard, or deliberate ignorance of the fact that records were being created and backdated in order to appear to auditors that Journey was in fact providing patients with updated treatment plans and the required amount of counseling services to patients.

145.    Richardson and Journey had actual knowledge, reckless disregard, or deliberate ignorance of the fact that Journey was submitting claims to Rhode Island Medicaid for the payment of the bundled HCPCS code H0020, indicating that patients were receiving all required OTP services, including updated treatment plans and adequate counseling services.

Case 1:20-cv-00451-MRD-AEM    Document 11    Filed 04/14/23    Page 26 of 34 PageID #: 115

## FIRST CAUSE OF ACTION
### (False Claims Act: Presenting and Causing False Claims; 31 U.S.C. § 3729(a)(1)(A))

146.     The United States re-alleges the preceding paragraphs as if fully set forth herein.

147.     Defendants The Journey to Hope, Health and Healing, Inc. and Kenneth Richardson, Jr., knowingly presented, or caused to be presented, thousands of false and fraudulent claims to Rhode Island Medicaid.

148.     These claims were false, *inter alia*, insofar as they sought reimbursement for bundled OTP services, which included updated individualized treatment plans and a minimum of one hour of substance abuse counseling per month, when patients did not have updated individualized treatment plans and/or were not receiving an hour of substance abuse counseling each month.

149.     These claims were additionally false in that they sought reimbursement for OTP services even though Journey was not in compliance with federal and state healthcare law OTP requirements.

150.     The false and fraudulent information in each claim was material to the Rhode Island Medicaid's decision to pay Defendants' false claims.

151.     The United States participated in Rhode Island Medicaid payments to the Defendants in reliance on the erroneous belief that Defendants were complying with all applicable state and federal requirements. This erroneous belief was material to the United States' decision to pay the federal share of payments to the Defendants.

152.     Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

153.     Defendants received at least $7,500,000 in reimbursement through Rhode

Island Medicaid for false and fraudulent claims.

154.     The United States sustained a loss from the Defendants' false and fraudulent claims.

155.     Defendants are liable to the United States under the False Claims Act for three times the loss sustained by the government; a civil penalty of not less than $5,500 and not more than $11,000 per false claim for violations occurring between September 28, 1999 and November 2, 2015 and a civil penalty of not less than $13,508 and not more than $27,018 per false claim for violations occurring after November 2, 2015; and the costs of this civil action brought to recover such penalty and damages. 31 U.S.C. § 3729(a)(1), (3); Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. 2461; 28 C.F.R. §§ 85.3(a)(9) (1999), 85.5.

## SECOND CAUSE OF ACTION
**(False Claims Act: False Record Material to False Claims; 31 U.S.C. § 3729(a)(1)(B))**

156.     The United States re-alleges the preceding paragraphs as if fully set forth herein.

157.     Defendants The Journey to Hope, Health and Healing, Inc. and Kenneth Richardson, Jr., knowingly made, used, or caused to be made or used, false records or statements material to claims to Rhode Island Medicaid. Among other false records or statements, Defendants created and backdated treatment plans and counseling records in preparation for CARF, EOHHS, and future audits.

158.     These records or statements were false, *inter alia*, insofar as they indicated such plans and records had been in place at the time that the Defendants submitted claims for payment to Rhode Island Medicaid.

159.     These false records or statements were material to the decision of Rhode

Island Medicaid to pay Defendants' false claims.

160.     The United States participated in Rhode Island Medicaid payments to the Defendants in reliance on the erroneous belief that Defendants were complying with all applicable state and federal requirements. This erroneous belief was material to the United States' decision to pay the federal share of payments to the Defendants.

161.     Defendants made, used, or caused to be made or used, said false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

162.     The United States sustained a loss from Defendants' false and fraudulent claims to Rhode Island Medicaid resulting from the false records or statements that Defendants made, used, or caused to be made or used.

163.     Defendants are liable to the United States under the False Claims Act for three times the loss sustained by the United States; a civil penalty of not less than $5,500 and not more than $11,000 per false claim for violations occurring between September 28, 1999 and November 2, 2015 and a civil penalty of not less than $13,508 and not more than $27,018 per false claim for violations occurring after November 2, 2015; and the costs of this civil action brought to recover such penalty and damages. 31 U.S.C. § 3729(a)(1), (3); Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. 2461; 28 C.F.R. §§ 85.3(a)(9) (1999), 85.5.

### THIRD CAUSE OF ACTION
**(R.I. False Claims Act: Presenting and Causing False Claims; R.I. G.L. § 9-1.1-1 *et seq.*)**

164.     The State of Rhode Island re-alleges the preceding paragraphs as if fully set forth herein.

165.     Defendants The Journey to Hope, Health and Healing, Inc. and Kenneth

Richardson, Jr., knowingly presented, or caused to be presented, thousands of false and fraudulent claims to Rhode Island Medicaid.

166.     These claims were false, *inter alia*, insofar as they sought reimbursement for bundled OTP services, which included updated individualized treatment plans and a minimum of one hour of substance abuse counseling per month, when patients did not have updated individualized treatment plans and/or were not receiving an hour of substance abuse counseling per month.

167.     These claims were additionally false in that they sought reimbursement for OTP services even though Journey was not in compliance with federal and state healthcare law OTP requirements.

168.     The false and fraudulent information in each claim was material to the State of Rhode Island's decision to pay Defendants' false claims.

169.     Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

170.     Defendants received approximately $7,500,000 in reimbursement through Rhode Island Medicaid for false and fraudulent claims.

171.     The State of Rhode Island sustained a loss from the Defendants' false and fraudulent claims.

172.     Defendants are liable to the State of Rhode Island under the Rhode Island False Claims Act for three times the loss sustained by the government; a civil penalty of not less than $5,500 and not more than $11,000 per false claim for violations occurring between September 28, 1999 and November 2, 2015 and a civil penalty of not less than $13,508 and not more than $27,018 per false claim for violations occurring after November 2, 2015; and the costs of this civil action brought to recover such penalty and damages. 31 U.S.C. §

3729(a)(1), (3); Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. 2461;

28 C.F.R. §§ 85.3(a)(9) (1999), 85.5; R.I.G.L. § 9-1.1-3(a)(7).

## FOURTH CAUSE OF ACTION
### (R.I. False Claims Act: False Records Material to False Claims; R.I. G.L. § 9-1.1-1 *et seq.*)

173.     The State of Rhode Island re-alleges the preceding paragraphs as if fully set forth herein.

174.     Defendants The Journey to Hope, Health and Healing, Inc. and Kenneth Richardson, Jr., knowingly made, used, or caused to be made or used, false records or statements material to claims to Rhode Island Medicaid. Among other false records or statements, Defendants created and backdated treatment plans and counseling records in preparation for CARF, EOHHS, and future audits.

175.     These records or statements were false, *inter alia*, insofar as they indicated such plans and records had been in place at the time that the Defendants submitted claims for payment to Rhode Island Medicaid.

176.     These false records or statements were material to the decision of the State of Rhode Island's decision to pay Defendants' false claims.

177.     Defendants made, used, or caused to be made or used, said false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

178.     The State of Rhode Island sustained a loss from Defendants' false and fraudulent claims to Rhode Island Medicaid resulting from the false records or statements that Defendants made, used, or caused to be made or used.

179.     Defendants are liable to the State of Rhode Island under the Rhode Island False Claims Act for three times the loss sustained by the State of Rhode Island; a civil

penalty of not less than $5,500 and not more than $11,000 per false claim for violations

occurring between September 28, 1999 and November 2, 2015 and a civil penalty of not less

than $13,508 and not more than $27,018 per false claim for violations occurring after

November 2, 2015; and the costs of this civil action brought to recover such penalty and

damages31 U.S.C. § 3729(a)(1), (3); Federal Civil Penalties Inflation Adjustment Act of

1990, 28 U.S.C. 2461; 28 C.F.R. §§ 85.3(a)(9) (1999), 85.5.

### FIFTH CAUSE OF ACTION
(Payment by Mistake)

180.     The United States and the State of Rhode Island re-allege the preceding

paragraphs as if fully set forth herein.

181.     As consequence of the acts set forth above, the United States and the State of

Rhode Island have paid money and/or participated in the payment of money to the

Defendants because of mistaken understandings of fact.

182.     The United States and the State of Rhode Island paid and/or participated in

the payment of money the Defendants for thousands of claims with the mistaken

understanding that the Defendants had met all the OTP requirements and had provided all of

the bundled MAT services in order to bill HCPCS code H0020, when in fact, such

requirements were not met and such services had not been provided.

183.     The United States' and the State of Rhode Island's mistaken belief was

material to their decision to pay Defendants' claims and/or participate in the payment of

Defendants' claims.

184.     Defendants are liable to account and pay to the United States and the State of

Rhode Island the payments that the United States and the State of Rhode Island made in

error.

## SIXTH CAUSE OF ACTION
### (Unjust Enrichment)

185.　　The United States and the State of Rhode Island re-allege the preceding paragraphs as if fully set forth herein.

186.　　As a consequence of the acts set forth above, the Defendants have obtained funds, directly or indirectly, to which they were not entitled, and have been unjustly enriched.

187.　　The United States and the State of Rhode Island conferred benefits upon the Defendants, the Defendants knew of and appreciated these benefits, and the Defendants' retention of these benefits under the circumstances would be unjust as a result of their conduct.

188.　　The United States and the State of Rhode Island therefore claim the recovery of all monies by which the Defendants have been unjustly enriched, in an amount to be determined, which in equity should be paid to the United States and to the State of Rhode Island.

## PRAYER FOR RELIEF

WHEREFORE, the United States and the State of Rhode Island demand and pray that judgment be entered in their favor against Defendants as follows:

I.　　On the First and Second Counts under the False Claims Act for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper.

II.　　On the Third and Fourth Counts under the Rhode Island False Claims Act for the amount of the State of Rhode Island's damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just

32

and proper.

   III.  On the Fifth and Sixth Counts for payment by mistake and unjust enrichment, for the damages sustained and/or amounts by which Defendants were unjustly enriched or were paid by mistake, or by which Defendants retained illegally-obtained monies, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

   IV.  Pre-and post-judgment interest, costs, and such other relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

   The United States and the State of Rhode Island demand a jury trial in this case.

Dated: April 14, 2023    Respectfully submitted,

           As to Counts I, II, V, and VI

           UNITED STATES OF AMERICA,
           By its Attorneys,

           ZACHARY A. CUNHA
           United States Attorney

           */s/ Bethany N. Wong*
           BETHANY N. WONG
           KEVIN LOVE HUBBARD
           Assistant United States Attorneys
           One Financial Plaza, 17th Floor
           Providence, Rhode Island 02903
           (401) 709-5000
           Bethany.Wong@usdoj.gov

           As to Counts III, IV, V, & VI

           STATE OF RHODE ISLAND,
           By its Attorneys,

PETER F. NERONHA
Attorney General

*/s/ Genevieve M. Allaire Johnson*
GENEVIEVE M. ALLAIRE JOHNSON
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
gallaire@riag.ri.gov