UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA; | ) | |
| and THE STATE OF RHODE ISLAND | ) | |
| *ex rel*.  SARA QUARESMA and | ) | Civil Action No. |
| MICHAEL DELMONICO, | ) | 20-CV-0451-JJM-LDA |
| | ) | |
| Plaintiffs and Relators, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| | ) | |
| THE JOURNEY TO HOPE, HEALTH and | ) | |
| HEALING, INC. and KENNETH L. RICHARDSON, | ) | |
| JR., Individually and in his Official Capacity, | ) | |
| | ) | |
| Defendants | ) | |

**FIRST AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
UNDER 31 U.S.C. § 3729 ET SEQ. AND STATE LAW COUNTERPARTS**

## I.    INTRODUCTION

This case involves the submission of false claims to Medicaid or Medicare for Methadone treatment, a highly controlled substance subject to the strict proscriptions of federal and state Controlled Substances Acts ("CSAs").  Drugs covered by CSAs pose a particularly high risk of patient harm and abuse.  As a Schedule II controlled substance, Methadone, is subject to strict federal and state regulation of the outpatient drug treatment centers that administer Methadone in treating drug dependent populations. Methadone, when taken in combination with alcohol or other controlled substances, including Fentanyl, benzodiazepines or other opiates, or when taken by individuals with certain underlying health issues, can pose a significant risk of harm, including death.  Patients receiving treatment with Methadone must be

closely managed, evaluated and monitored.  This case involves the submission of false claims to Medicaid and Medicare for services that were not rendered and/or that were so deficient as to be worthless.

1.      Sara Quaresma and Michael DelMonico, (collectively, as "Relators"), by and through their attorneys, HERMAN LAW GROUP, as and for their First Amended Complaint ("FAC"), bring this civil *qui tam* action as Relators, or whistleblowers, on behalf of the United States of America pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729 *et seq*. ("FCA") and the Rhode Island False Claims Act, R.I.G.L. §9-9.1-1 *et seq*. against Defendant The Journey to Hope, Health, and Healing, Inc. ("The Journey") and against Defendant Kenneth L. Richardson, Jr., in his individual and professional capacities ("Richardson"), (collectively as "Defendants") and for retaliating against Relator Quaresma for reporting Defendants' unlawful conduct to government agencies in violation of the whistleblower provisions of the federal and state False Claims Acts and the Rhode Island Whistleblower Protection Act.

2.      For years and continuing to present, Defendants have knowingly submitted false claims to Medicare and Medicaid for methadone treatment services that were not rendered or that were so deficient as to be worthless services.

3.      Many patients at the Journey have for years, been receiving treatment with methadone while continuing to abuse dangerous drugs and/ or alcohol.  Many patients suffer from underlying mental and physical health issues that, for years go untreated. As a consequence of the lack of care provided, patients are at significant risk of harm and even death. Relators estimate that on average, one patient a month dies while receiving treatment at The Journey.

4.      The violations alleged herein involve false and fraudulent claims that the Defendants have made or caused to be made since at least 2017.

5.      The FCA and Rhode Island FCA provide that any  person who knowingly  submits or causes to be submitted a false or fraudulent claim to the government for payment or approval is liable for

civil penalties for each such claim submitted or paid, plus up to three times the amount of the damages sustained by the government as well as other relief that the court may deem appropriate.

6.      Relators Sara Quaresma and Michael DelMonico (collectively "Relators"), current and former employees of Defendants respectfully, are the original sources of the information in this *qui tam* action.

7.      As detailed below, this action concerns the deliberate fraudulent billing for services that were not delivered and/or that were so deficient as to be worthless.

8.      Generally, as detailed below, this action concerns the misrepresentations of patients' charts and lack of services rendered that were billed to Medicaid since at least 2017 and to Medicare since about January, 2020.

9.      Defendants are retaliating against Relator Quaresma by ridiculing and disparaging her, isolating her, interfering with her ability to perform her job, and threatening her with termination of employment because she reported and tried to stop Defendants' unlawful billing practices, including reporting Defendants' illegal conduct to the Department of Behavioral Healthcare, Developmental Disabilities and Hospitals ("BHDDH"), the Rhode Island State Agency tasked with monitoring substance abuse rehabilitation centers and to the Medicaid Fraud Unit of the Rhode Island Attorney General's Office.

10.     On August 28, 2020, Relators submitted a written disclosure statement to the federal government disclosing "substantially all material evidence and information" in their possession.  On September 28, 2020, the Relators provided the State of Rhode Island with a written disclosure statement disclosing "substantially all material evidence and information" in their possession.

## II.  <u>JURISDICTION AND VENUE</u>

11.     All Counts of this FAC are civil actions by Relators, acting on behalf of and in the name of the United States and the state plaintiffs, against the Defendants under the federal False Claims Act,

31 U.S.C. §§ 3729-3733, and analogous state false claims laws.

12.     This Court has jurisdiction over the claims brought on behalf of the United States pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(a).

13.     This Court has supplemental jurisdiction over the claims brought on behalf of the state plaintiffs under 28 U.S.C. § 1367.  In addition, the Court has jurisdiction over the state law claims alleged herein under 31 U.S.C. § 3732(b).

14.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §3732(a) which provides that any action under the False Claims Act may be brought "in any judicial district in which . . . in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." 31 U.S.C. § 3732(a). Venue is also proper under 28 U.S.C. § 1391.

### III.     THE PARTIES

15.     Relator Sara Quaresma ("Quaresma") is a Health Home Team Coordinator at the Journey. Ms. Quaresma began her employment at The Journey on or about October 28, 2019.

16.     Relator Michael DelMonico ("DelMonico") is a former employee of The Journey, where he worked as a Substance Abuse Counselor from September, 2019 until he resigned his employment in July, 2020.

17.     Defendant, The Journey is a Rhode Island corporation with its corporate office located at 985 Plainfield Street, Johnston, Rhode Island 02919.  The Journey operates four outpatient drug treatment centers in the State of Rhode Island.

18.     Defendant Kenneth L. Richardson, Jr. ("Richardson") is the Chief Executive Officer of the Journey.

## IV.    <u>GENERAL BACKGROUND FACTS</u>

19.    Defendant The Journey is an outpatient treatment provider that provides drug and alcohol treatment as well as mental health services to recovering alcohol and drug addicted persons.

20.    Defendants participate in the Federal and State Medicaid Program and in the Federal Medicare Program.

21.    Defendants operate substance abuse centers located in Johnston, Rhode Island, Providence Rhode Island, Middletown, Rhode Island and Westerly, Rhode Island.

22.    Defendants provide medication assisted treatment that includes Methadone and Suboxone.

23.    Prior to January 1, 2020, the United States Medicaid program provided the primary source of funding and revenue for Defendants' outpatient treatment centers.  Medicaid coverage extends to all services that Defendants provided to their patients.

24.    As of January 1, 2020, the United States Medicare program has become a source of funding and revenue for Defendants' outpatient treatment centers and serves as the primary source of reimbursement for duel eligible patients.  Medicare coverage extends to all services that Defendants provided to their patients.

25.    Defendants' treatment centers are privately owned and are regulated by the Department of Behavioral Health, Developmental disabilities and Hospitals ("BHDDH"), which is a Rhode Island State Agency created in part to regulate drug and alcohol treatment centers.

26.    Relators file this FAC pursuant to the FCA and Rhode Island FCA to assert that the Defendants engaged in the following unlawful activity in violation of the FCA and Rhode Island FCA:

a.    Defendant The Journey and its agents conspired to engage in fraudulent billing schemes;

b.    Defendants have and continue to submit claims for reimbursement to Medicare and Medicaid for services that were not rendered;

5

c.     Defendants have and continue to submit claims for reimbursement to Medicare and Medicaid for treatment that is deficient as to be worthless;

d.     Defendants' counselors, nurses and directors routinely backdated and then signed patients' medical charts to create the illusion that services were rendered and that they completed their work in compliance with 42 C.F.R. §8 *et seq* and 212 RI ADC 10-10-1 *et seq*.;

e.     Defendants' directors and supervisors fraudulently completed patient charts for patients assigned to other counselors and for whom they had never performed the work for which they billed Medicaid and Medicare;

f.      Defendants' directors and supervisors instructed and paid counselors to fraudulently complete patient charts for services that were not provided by these counselors and for work not performed by other counselors for which they billed Medicaid and Medicare;

g.     Defendants' patient files were and continue to be missing numerous records that are necessary to receive Medicaid and Medicare payments such as, counseling records, medical records including blood tests and EKGs, psychosocial records, treatment plans and progress notes;

h.     Defendants paid individuals, including unlicensed and inexperienced counselors to complete the charts of counselors who no longer worked at the facility but for whom Defendants had already submitted requests for payment from Medicaid and Medicare so that the charts appeared to comply with 42 C.F.R. §8 *et seq*. and 212 RI ADC 10-10-1 et seq.; and

i.      Defendants have retaliated against Relator Sara Quaresma by ridiculing, disparaging and isolating her and threatening her with termination of employment because they believe that she informed BHDDH about The Journey's unlawful billing practices in violation of the FCA and the Rhode Island FCA.

## V.  **STATUTORY FRAMEWORK**

A.  **Government Healthcare Programs**

   1.  **The Medicare Part B Program**

27.    The United States, through its Department of Health & Human Services ("HHS"), administers the Supplementary Medical Insurance Program for the Aged and Disabled established by Part B, Title XVIII, of the Social Security Act, 42 U.S.C. §§ 1395j-1395w-4 (the "Medicare Part B Program").  HHS has delegated the administration of the Medicare Part B Program to its component agency, the Centers for Medicare & Medicaid Services ("CMS").

28.    The Medicare Part B Program is a federally subsidized health insurance program for persons who are 65 years of age or older, and for those who are disabled.  Eligible individuals may enroll in the Medicare Part B Program to obtain benefits in return for payments of monthly premiums as established by HHS.

29.    The Medicare Part B Program is funded by contributions from the federal treasury, and by insurance premiums paid by enrolled beneficiaries.

30.    The Medicare Part B Program pays for medical and other health services provided to enrolled beneficiaries by physicians and healthcare entities.

31.    Physicians and healthcare entities who are participating providers in the Medicare Part B Program may seek reimbursement from Medicare Part B for services rendered to enrolled beneficiaries, provided that the services are rendered in compliance with the laws, rules, regulations, policies, and procedures governing reimbursement.

32.    The Medicare Part B Program only pays for services that are reasonable and necessary for the diagnosis or treatment of illness or injury.  42 U.S.C. § 1395y(a)(1)(A).

33.    Since January 1, 2020, Medicare Part B through CMS, reimburses certified Opioid Treatment Programs (OTPs) through bundled payments for opioid use disorder (OUD) treatment services.  Bundled

payments are made for the dispensation of methadone and suboxone, their administration, substance use counseling, individual and group therapy, toxicology testing, intakes, and periodic assessments.

34.    At all times relevant, The Journey was enrolled in the Medicare Part B Program.

**2.   The Rhode Island Medicaid Program**

35.    Funding for Medicaid is shared between the federal Government and those states participating in the Medicaid program. Title XIX of the Social Security Act (42 U.S.C. §§ 1396 *et seq.*) known as the Medicaid Act ("Act"), grants states the authority to provide medical and rehabilitative services to poor, elderly and disabled people, including outpatient services for alcohol and drug abuse treatment programs.

36.    In Rhode Island, the Medicaid program was established pursuant to R.I. Gen. L. Chapters 40-8, 42-7.2 and administrative regulations set forth in 210 R.I. Code R. § 20-00-1.5.  The Rhode Island Office of Health and Human Services administers the Medicaid program in Rhode Island.

37.    Pursuant to 210 R.I. Code R. § 20-00-1.5, a Rhode Island Medicaid provider is required to comply with all federal and Rhode Island statutes and regulations pertaining to Medicaid.

38.    Physicians or healthcare entities who are participating providers in the Rhode Island Medicaid Program may seek reimbursement for services rendered to enrolled beneficiaries, provided that the services are rendered in compliance with the laws, rules, regulations, policies, and procedures governing reimbursement.

39.    The Rhode Island Medicaid Program only pays for services that are medically necessary.

40.    This FAC specifically involves allegations of fraudulent billing and fraudulent recordkeeping practices at Defendants' outpatient drug treatment program.

41.    Pursuant to the Rhode Island regulations, Medicaid service provider's must prepare and maintain contemporaneous records demonstrating a provider's right to receive payment under the

medical assistance program.

42.    When providers submit bills to Medicaid for payment, they are certifying that the information provided in relation to any claim for payment shall be true, accurate and complete; and providers also agree to comply with the rules, regulations and official directives of the Act and the Rhode Island Office of Health and Human Services.

43.    The services must meet the standard established in 45 CFR §8 *et seq*. and 212 RI ADC 10-10-1 *et seq*. and be documented in the patient's records and reviewed by staff as required.

44.    As codified in the Patient Protection and Affordable Care Act of 2010, Pub. L No. 111-148, 6402(f), 124 Stat. 119, codified at 42 U.S.C. § 1320a-7b(g), "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]."

45.    Medicaid and Medicare require that services be provided by qualified staff members.

46.    Further, Medicaid and Medicare service providers certify that it "agree[s] to abide by all applicable Federal and State laws as well as the rules and regulations of other Rhode Island state agencies particular to the type of program covered by this enrollment application."

47.    During all relevant times, Defendants were in the business of providing drug treatment services to Medicaid and Medicare recipients and have received payment for these services from Medicaid and Medicare.

**3.  Federal Regulation of OTPs**

48.    Federal law requires that OTPs provide drug treatment services to patients that include medical, counseling, vocational, educational and other assessment and treatment services in addition to the prescribed medication.  42 C.F.R. § 8.12 *et seq*.  More specifically, OTPs must provide full medical examination services within 14 days of admission; must undertake initial and periodic assessment services, including initial and updated treatment plans and counseling services.

42 C.F.R. § 8.12(f)(2)(4)(5). OTPs must establish and maintain a recordkeeping system that is adequate to documents and monitor patient care.  42 C.F.R. § 8.12(g).  Under federal regulations, methadone can only be administered in an OTP that is certified by the Substance Abuse and Mental Health Services Administration (SAMHSA).  Moreover, as a condition of payment, OTPs must also be accredited and certified by SAMSHA.  42 CFR § 8 .12.

### 4.  Rhode Island State Regulation of OTPs

49.    OTPs operating in Rhode Island must be licensed by Department of Behavioral Health, Developmental Disabilities and Hospitals ("DBHDH") and must comply with DBHDH rules and regulations and other state laws regarding drug treatment.  212 RI ADC 10-10-1.   DBHDH regulations specifically include the delivery of Medication Assisted Treatment rendered by OPTs.  212 RI ADC 10-10-1.6.14.   All organizations licensed by BHDDH to provide services and programs are required to have staff with appropriate training, education, experience, credentials and licenses to deliver the services and programs. 212 RI ADC 10-10-1.6.(A). The regulations require that all the providers complete a particularized Biopsychosocial Assessment for each person considered for admission to the organization. 212 RI ADC 10-10-1.6.2.  The Biopsychosocial Assessment must include the patient's physical and psychological status and social functioning as set forth in the regulation.  *Id*.   The Biopsychosocial Assessment must include a preliminary treatment plan that at minimum includes individual goals and service needs and identifies preliminary treatment goals and interventions.  *Id*. at 16.2(C).  The provider who is responsible for implementing the treatment plan and the date it is to be completed must be documented.  *Id*. at 16.2(D).  The treatment plan must be reviewed and updated at least once every 12 months and validated with the signature of a clinical supervisor within 14 days of completion if the services are provided by unlicensed clinical staff.  *Id*. at 16.2(F).  Assessment reviews and updates must be conducted in face-to-face interviews with the patient.  *Id*. at 16.2(G).   Staff performing the

Biopsychosocial Assessments must meet particular educational and licensing requirements. *Id*. at 16.2(I). Based on the Biopsychosocial Assessment, a specific goal-oriented, recovery focused, individualized Treatment Plan must be developed and implemented for each patient. *Id*. at 1.6.3 The Treatment Plan must be signed by the patient and the primary provider. Id. at 1.6.3(5(e). A new Treatment Plan must be developed at least every 12 months. *Id*. at 1.6.3(C). Treatment Plans must be reassessed, updated and modified every 6 months and upon additionally defined circumstances. *Id*. at 1.6.4 The results of the treatment plan review must be specifically referenced in the treatment plan and signed and validated in accordance with the regulations. *Id*. at 1.6.4(B)(C). The patient's status and progress relative to the treatment plan must be documented in the treatment record as progress notes. *Id*. at 1.6.5. A Transition/Discharge Summary and Aftercare Plan ("Discharge Plan") is also required. The Discharge Plan must be developed in partnership with the patient and a copy provided to the patient. *Id*. at 1.6.6.

50.    Rhode Island State regulations also require that regular supervision be provided to any unlicensed staff who provide direct patient care. A minimum of four hours of supervision per month is required. 212 RI ADC 10-10-1.6(B)(4)(6).

51.    Providers who render Medication Assisted Treatment, including Opioid Treatment Programs ("OTPs") are governed by additional and more stringent federal and state regulations. Specifically, OTPs in Rhode Island must comply with the additional requirements set forth in 212 RI ADC 10-10-1.6.14 and with state laws governing the dispensation of controlled substances, drug abuse and drug abuse reporting and the State Methadone Treatment Guidelines. R.I.G.L. §§ 5-19.1; 21-28; 21-28.2 and 21-28.3. A physical health assessment that includes the patient's medical history and physical examination must be completed within the first 24 hours of the patient's admission into the program. 212 RI ADC 10-10-1.6.14(A)(5)(g). The initial Treatment Plan must be completed within 90 days of the patient's admission to the OTP. *Id*. at 1.6.14(A)(10)(a). The treatment Plan must be reviewed, revised and updated

every 6 months.  *Id*. at 10(b).  A new treatment plan is required at least one every 12 months.  *Id*. at 10(c). Clinical staff caseloads should not exceed an average staff to client ratio of 1:60. *Id*. at 1.6.14(A)(5)(d). All patients of OTPs must receive a medical examination at least annually. *Id*. at 1.6.14(11)(g). All medical procedures performed at the time of admission shall be reviewed by the medical staff annually and all clinically indicted tests and procedures shall be repeated.  *Id.* at 1.6.14(11)(h). Medical staff are required to record the results of the annual medical examination and review of patient medical records in each patient's record. *Id*. at 1.6.14(11)(i).

52.    Rehabilitative counseling services must be provided to patients by OTP staff. The counseling services are to be individualized and patient centered. A minimum of one 1 session per month is required.  *Id*. at 10(e).

53.    OTP Health Homes must meet all regulatory requirements set forth in 1.6.14(A) and 1.6.14(B).

### 5.  **Coding Criteria**

54.    Healthcare providers use a uniform system of coding to report the services and procedures furnished to patients.  The Physicians Current Procedural Terminology ("CPT") code set is a medical code set maintained by the American Medical Association. CPT codes identify services and procedures rendered to patients during encounters with healthcare providers.

55.    Healthcare providers use the CPT code set when billing the Government Healthcare Programs for most services. Each CPT code is assigned an allowable charge by the payor, which is then published in the payor's fee schedule.

56.    Healthcare providers must use the appropriate CPT code on claims in order to receive reimbursement from the Government Healthcare Programs.  In order to bill any code, the services rendered must meet the definition of that code.   It is the provider's responsibility to ensure that the codes selected

reflect the services furnished.

57.     The CPT code to bill Medicaid for methadone bundled treatment services is H0020.   The bundled rate includes all methadone assisted treatment, including dispensing and administration; substance use counseling, medical examinations and testing.

58.     The CPT code to bill Medicare for methadone bundled treatment services is G2067.  The bundled rate includes all methadone assisted treatment, including dispensing and/or administration, substance use counseling, individual and group therapy and toxicology testing.

59.     At all relevant times, The Journey employees (typically non-physician practitioners) administered methadone to beneficiaries of the Government Healthcare Programs. The Journey bills Medicaid for methadone assisted treatment using CPT Code H0020. Since January, 2020, in most instances, the Journey uses CPT Code G2067 when billing Medicare for methadone assisted treatment.

## VI.   SPECIFIC FACTUAL ALLEGATIONS

60.     Relators have direct and independent knowledge of the information on which these allegations are based and have voluntarily provided the information to the government for filing a *qui tam* claim based on the investigation.

61.     Relators' knowledge comes from having worked for Defendants collectively from July, 2019 to the present.

62.     Relators are the original source of the facts and information upon which the action is based.

63.     Relators have provided the United States Attorney's Office for the District of Rhode Island and the Rhode Island State Attorney General's Office statements and documents detailing known material evidence and information.

A.    **Defendants Submitted False Claims And Created False Records For Methadone Treatment Services Not Rendered or That Were So Deficient as To Be Worthless**

64.    Since at least 2017, Defendants have improperly billed Medicaid for methadone treatment services that were not actually provided. These services include initial and periodic biopsychosocial assessments, treatment plans, counseling services and physical examination and medical testing.

65.    At all relevant times, The Journey administered methadone to its patients for substance abuse treatment.  Many patients receive methadone doses daily.

66.    Beyond these methadone administration visits, patients infrequently met with a physician or a non-physician practitioner for an examination, for counseling, medical testing or other drug treatment services.

67.    To document any treatment, nurses and the counselors use the "Methasoft" software program.  The Methasoft program automatically records the date, time, and type of treatment rendered and the duration of any counseling services.

68.    The Journey typically administers methadone to approximately 1000 patients at any given time. The counselors routinely spend 5 to 10 minutes per month providing counseling services, often times less or no time at all.

69.    Despite the fact that the Journey has failed to provide required assessments, failed to develop and update treatment plans, failed to provide counseling services, failed to perform physical examinations and medical testing, and otherwise failed to exercise any treatment-related decision-making, the Journey has and continues to submit claims to Government Health Programs for reimbursement for these services.

70.    For years, many patients at The Journey have continued to actively use dangerous drugs, including fentanyl, cocaine and benzodiazepines while receiving methadone.  Examples include: Patient number 1 for whom The Journey has been submitting weekly claims for methadone treatment

services using CPT Code H0020 since 2011; Patient number 2, in which no blood serology testing has been performed; no 2019 annual physical performed; treatment plans lack dates, patient and supervisor signatures. The Journey has been submitting weekly claims for methadone treatment services for Patient number 2 using CPT Code H0020 since December 29, 2017; patient number 3, in which no 2018 physical was performed; no urine drug screens were performed for March, 2020, April, 2020, May, 2020, June, 2020 or August, 2020. In 2019, the patient was only given five urine drug screes. The treatment plan is unsigned by the patient, clinician and supervisor and contains the name of a different patient. The Journey has been submitting weekly claims to Medicaid since February 17, 2016. Patient number 4, in which no blood serology testing has been performed; no 2019 annual physical was performed and the 2020 treatment plans were backdated and lack clinical supervisor signatures. The Journey has been submitting weekly claims to Medicaid for methadone treatment services for this patient since August 2017; and Patient number 5 for whom The Journey has been submitting weekly claims to Medicaid for the periods July, 3, 2018 to April 26, 2019; June 4, 2019 to August 4, 2019; and October 14, 2020 to present.

71.    Relator DelMonico was employed by the Defendants as substance abuse counselor.

72.    Relator Quaresma is currently employed by the Defendants as the Health Home Team Coordinator.

73.    Relator DelMonico was responsible for conducting initial intakes, which in part determined a client's eligibility to enroll in the program. Relator DelMonico was also charged with drafting psychosocial evaluations to properly document a client history, devising treatment plans to chart a course of treatment, providing at least 60 minutes of counseling services per month, documenting the patient's file with progress notes to track the patient's progress after each session, and writing discharge summaries carefully explaining why the patient is no longer in need or eligible for the treatment provided.  His

primary job function was to provide counseling services in Defendants' outpatient drug treatment center.

74.    Relator Quaresma is charged with overseeing The Journey's Health Home program that coordinates and integrates patient drug treatment, medical care, behavioral health, social services and community-based support.

75.    Throughout Relators' employment and prior thereto, Defendants have chronically billed for counseling services, biopsychosocial assessments, treatment plans and medical services that were never rendered.

76.    Throughout Relators' employment and prior thereto, Defendants have chronically billed Medicaid and Medicare for service when patients' medical charts were inadequately maintained pursuant to federal and state regulations.

77.    In numerous cases under Defendants' direction, falsified chart documentation was prepared months to years after Defendants had billed Government health programs for services.

78.    Defendants employ approximately 20-23 counselors at any given time. Only approximately 6 are licensed by the State of Rhode Island. Many lack the requisite educational background and experience necessary to render drug counseling services.

79.    To the extent that Defendants render any counseling services, it frequently consists of five to ten minutes of counseling per month.

80.    In contravention of state and/or federal regulations, Defendants assign unlicensed and unsupervised counselors to perform Biopsychosocial Assessments and develop Treatment Plans for patients admitted for drug treatment at the Journey.

81.    In contravention of state and/or federal regulations, Defendants routinely fail to provide physical health assessments, including physical examinations.  Required medical tests, including blood tests and EKGs are frequently not conducted nor are medical reviews performed.

82.     Relator DelMonico began working at The Journey on September 3, 2019 as a Substance Abuse Counselor.  Relator DelMonico is neither a licensed counselor nor licensed in the treatment of chemical dependency.

83.     As a drug treatment counselor at the Journey, Mr. DelMonico was tasked with preparing biopsychosocial assessments, developing treatment plans and performing counseling services. Despite the fact that Relator DelMonico was not licensed and had no prior educational or other relevant training, the Journey rarely provided Relator DelMonico with supervision. Relator DelMonico estimates that during some months, at most, he received one hour of supervision and during other months, he received no supervision at all.

84.     From just about the time that Relator DelMonico began his employment at the Journey through his resignation in July, 2020, he was instructed to devote the majority of his time identifying patients for whom required services had not been delivered, reviewing patient charts for missing documentation, including missing Assessments, Treatment Plans, Transition Plans and Counseling Notes.

85.     In anticipation of upcoming state and federal audits and a CARF accreditation survey, D.C., Executive Director, M.D., Program Manager  and other Journey managers,  sought to hide the deficiencies in patient care by creating false treatment records;  backdating records; falsely certifying that patients were assigned to them; forging signatures of actual treating providers and forging patient signatures to conceal the fact that services billed to Government Healthcare Programs were never delivered.

86.     Throughout Relator DelMonico's employment at the Journey, D.C. and M.D. instructed Relator DelMonico to create a report of patients for whom documentation of required services was missing.

87.     Relator DelMonico was instructed to sign treatment records created by D.C. and M.D.  that had been backdated and that were created for patients that at the time were not assigned to him.

88.     Relator DelMonico is aware that D.C., M.D. and other managers at the Journey repeatedly created and backdated patient records to reflect treatment they had not received and for patients who they were not treating. These false documentation practices ramped up in advance of state and federal audits.

89.     Upon his hire, Relator DelMonico was advised by D.C. that he need only provide 45 minutes of counseling but to document the counseling as being 60 minutes.

90.     Upon his hire, D.C. advised Relator DelMonico of an upcoming CARF audit.  She instructed Relator DelMonico to review selected charts that she intended to provide to CARF and to review the charts for any missing documentation.

91.     D.C. advised Relator DelMonico that the Journey was not going provide CARF with patient charts of another counselor because the charts were "wrong" and the counselor "refused to fix" them.

92.     On September 26, 2019, D.C.  provided CARF with 11 patient charts from the Journey's Providence location.

93.     D.C. advised staff at the Journey that she wanted 20 patient charts completed and "fixed" within two weeks. She chastised staff for failing to "fix" charts on time.

94.     Shortly after Relator DelMonico began his employment, the Journey was to undergo a state audit.  Again, in anticipation of the audit, staff were instructed to "fix" patient charts. A Clinical Supervisor who was tasked with reviewing patient charts stated that he "reviewed the records that the state will be here to review in a few weeks and they are some of the worst I've seen. I am trying to wrap my head around a person's chart having nothing done or updated in 2 YEARS!!...And, I want to add, this is the condition of 95% of the charts I've been reviewing!"

95.     Despite their knowledge that required services were not being delivered, The Journey continued to fabricate treatment notes, backdating them in order to submit false claims to Medicaid.

96.     On July 1, 2019, the Journey changed treatment forms from those previously used by the clinicians, including forms for Assessments, Treatment Plans and Transition Plans.  In many instances, the falsified and backdated treatment records were created on the new forms but backdated to a date prior to the implementation of the forms used.

97.     In September, 2019, in preparation for the upcoming CARF survey scheduled for October 30, 2019 to November 1, 2019, D.C. requested staff to "have selected charts ready by end of September and then [she] will review them."  After reviewing those charts selected, she rejected them and requested that new charts be selected for the CARF audit because "the ones prior have had 0 updates", meaning no updated Treatment Plans, Assessments, Master Problem Lists and other documentation that required updating.

98.     Per state regulations, caseloads are not to exceed 60 per staff member.  In fact, the caseloads routinely far exceeded 60 patients per staff member, with caseloads as high as 87 patients per staff member.

99.     In about October, 2019, A.M., a counselor and T.C., Case Manager, advised Relator DelMonico that they were going to the Johnston, RI clinic to assist with fixing the charts.

100.    Throughout their employment at The Journey, Defendant Richardson pressured The Journey staff to find ways to increase the number of patients being treated at the Journey.

101.    By email to all staff dated October 20, 2019, Defendant Richardson thanked The Journey staff for their work in preparing for the state and CARF audits.  He stated that The Journey had been "unprepared" in the past for state and CARF audits but that they hired D.C. and everyone was to follow her lead.

102.    In late 2019, Mr. Richardson decided to hold a raffle to increase patients at the clinic locations.   Staff were instructed to notify all patients of the Journey that if they referred a new patient to

the Journey, their names would be entered into a raffle to win a free television. The raffle was held at each clinic location and The Journey gave away four televisions, one at each clinic locations.

103.    Based on pressure to maintain and increase the patient population at The Journey, staff are instructed to maintain patients on caseload regardless of whether The Journey's services are medically appropriate and regardless of whether the patient is compliant with drug treatment.

104.    At the Providence and Johnston, RI locations, approximately 70% of patients have been on caseload for three or more years, some as long as ten years, many of whom have not received counseling or other behavioral health treatment for months at a time.  At the Westerly, RI location, the percentage is approximately 60%.

105.    Relator DelMonico was advised by the Providence location's Clinical Supervisor D.D. that, regardless of the patient's conduct or lack of cooperation with treatment, patients cannot be discharged.

106.    During a meeting on November 22, 2019 with D.C., D.D., and Relator DelMonico, D.C. informed Relator DelMonico that he was taking too long completing paperwork and that she was going to assist him in completing Treatment Plans, Transition Plans, Assessments and Master Problem Lists. She advised him that documents needed to be backdated "to fill in the gaps" as necessary and again instructed him to have A.M., another counselor at the Providence, RI location, sign them in the event they needed backdating to a time prior to Relator DelMonico's employment at The Journey.

107.    In January, 2020 while touring the Middletown clinic, M.D. asked Relator DelMonico if he would like to obtain licensure as a LCDP (Licensed Chemical Dependency Professional).  M.D. stated that he would lie to the state about Relator DelMonico's experience in order to appear that Relator DelMonico satisfied the requisite 2000 hours of patient contact.  Relator DelMonico declined M.D.'s offer.  On February 10, 2020, Relator DelMonico was transferred from the Providence, RI clinic location

to the Middletown clinic.

108.    On May 30, 2020, Relator DelMonico reported The Journey's ongoing fraudulent practices to Ken Richardson via telephone.   In response, Mr. Richardson advised Relator DelMonico that he was frustrated with D.C. and M.D. but that that there was nothing he could do to stop the fraud because he needed the expertise of D.C. and M.D. in managing OTPs and their knowledge of federal and state regulations.   He urged Relator DelMonico not to report the fraud to state regulators, including BHDDH, because it would "hurt" Relator DelMonico's fellow employees and the company.   Mr. Richardson stated Relator DelMonico needed to learn to deal with people like M.D. and D.C. because he will have to deal with this throughout his career.

109.    On July 6, 2020, Relator DelMonico gave notice to Mr. Richardson of his intent to resign his employment at The Journey.   Mr. Richardson stated that M.D. and D.C. had informed him that it was Relator Quaresma who "went to the state" to report the unlawful practices at The Journey.   Mr. Richardson stated to Relator DelMonico that he hoped it was not Ms. Quaresma who reported The Journey to state officials and that employees must first follow the chain of command before reporting concerns to outside state regulators.   Effective July 21, 2020, Relator DelMonico resigned his employment at The Journey.

110.    The examples that follow are a summary of the Defendants' and their employees' and agents' fraudulent conduct; however, they do not encompass the entirety of Defendants' wrongful conduct.   Additional examples are set forth in Exhibit A to the within FAC.

111.    In early October, 2019, D.C. instructed Relator DelMonico to falsify 5 patient charts; chart numbers 6, 7, 8, 9 and 10.   In particular, she instructed Relator DelMonico to create and/or "redo" all of the annual Biopsychosocial Assessments, the Treatment Plans and Transition Plans because the vast majority of these services had never been provided and none of them were documented.   D.C. further instructed Relator DelMonico to have A.M.  backdate and signed the documentation since A.M. had been

working at the Providence location during the backdated period.  While some of the patients had previously been patients of A.M., others had never been treated by her.

112.    On October 8, 2019, M.D., The Journey's Program Manager forwarded Relator DelMonico a Master Problem List that D.C. had prepared for patient number 8 and instructed Relator DelMonico to sign and backdate this document despite the fact that Relator DelMonico did not treat this patient.

113.    On October 15, 2019, D.C. sent Relator DelMonico an email instructing him to review certain patient charts, including patient numbers 11 and 6.  The chart for patient number 11 did not contain a 2019 Biopsychosocial Assessment; nor Master Problem List; nor Treatment Plan updates for the period February 2018 through August, 2019; nor any Treatment Plan for the period August 2019 through February 2020. As to the chart for patient number 6, there were no 2018 or 2019 Biopsychosocial Assessments; no Master Problem List; no Treatment Plans for the periods October 2017 through April, 2018; April, 2018 through April, 2019; April 2019 through October, 2019; and October, 2019 through April, 2020. In effect, this patient had not received a compliant treatment plan for two years of drug treatment.

114.    On or about October 17, 2019, D.C. advised Relator DelMonico that that she "re-typed" the "original assessment" for patient number 11; that she prepared a treatment plan review and a new treatment plan for this patient, despite the fact that D.C. had never treated this patient. D.C. instructed Relator DelMonico to backdate these documents, sign them and obtain the patient's signature.

115.    On October 20, 2019, M.D. sent an email to the Johnston clinic staff regarding one of the charts that was the subject of the CARF survey.  He noted that "Patient has been here a month, but has no annual physical and no doctors admittance note.  Can anyone tell me what's going on with her, in reference to her medical intake…We need that paperwork in file and electronic done by doctor ASAP.  This is one of the CARF charts."

116.    In November, 2019, A.M., an unlicensed chemical dependency counselor, was instructed to create and backdate Treatment Plans for patient number 12.   The Treatment Plans were prepared on forms that only been used since July, 2019.  The Treatment Plans, however, were dated February, 2018, August, 2018 and March, 2019.

117.    In mid-November, 2019, Relator Quaresma met with D.C. and M.D. in D.C.'s office.  Ms. Quaresma observed documentation from several patient charts laid out on the floor in the office.  D.C. stated that The Journey was undergoing a CMS Integrity Audit, that the documents on the floor were removed from patient charts and were documents that CMS had requested to review.  D.C. stated that she had to "fix" these documents before providing them to CMS.

118.    On November 27, 2019, with regard to patient number 206, D.C. emailed Relator DelMonico a Treatment Plan, an annual Assessment and Master Problem List which were backdated to September, 2019.  She instructed Relator DelMonico to sign the documents.  No blood tests have been performed for Patient number 13, nor did the patient receive a 2019 annual physical examination.  Since December 28, 2018, Defendants have submitted weekly claims to Medicaid under CPT H0020 for Patient number 13.   D.C. also requested that Relator DelMonico sign backdated treatment documents that she prepared for patient number 14, a patient who had been receiving methadone at the Providence location since 2014. Neither Relator DelMonico nor D.C. had treated either of these patients at the time of the backdate. No annual physical examinations were performed in 2015, 2016, 2018 or 2020. The Journey has submitted weekly claims to Medicaid using CPT Code H0020 from August, 2014 to present.

119.    On December 4, 2019, K.G., the Journey's Program Manager, requested that Relator Quaresma assist staff in preparing and backdating Health Home services progress notes to November 2019, in order to submit claims to Medicaid for reimbursement for Health Home services that were not delivered.  Relator Quaresma advised K.G. that doing so constitutes fraud.  Relator Quaresma reported

this concern to the Journey's CFO A.B., to D.C. and to M.D.

120.    On December 21, 2019, D.C. again sent Mr. DelMonico a backdated Treatment Plan she prepared for a patient in the Providence location, patient number 15, and again instructed Relator DelMonico to sign the Treatment Plan. The Journey has submitted weekly claims to Medicaid using CPT H0020 from May 30, 2016 to January 1, 2020 and to Medicare using CPT Code G2067 since January, 2020.  On December 22, 2019, D.C. sent Relator DelMonico a Treatment Plan, annual Biopsychosocial Assessment and Master Problem List for patient number 16 that she had also backdated and instructed him to sign it.  Neither Relator DelMonico nor D.C. had treated these patients at the time of the backdating.

121.    In mid-March, 2020, C.V. advised Relator Quaresma that no Treatment Plans nor Assessments had been done for most of her patients since 2017.

122.    On March 30, 2020, M.D. provided certain counselor a template for use in crafting backdated counseling notes.

123.    M.D. falsified created falsified counseling notes for services that were not delivered and for which claims for payment to Medicaid were submitted.   He did so with regard to approximately 40 patients that were not assigned to him.

124.    The counseling notes state that sixty minutes of counseling was delivered to patients receiving methadone treatment at the various Middletown, Westerly and Johnston, Rhode Island locations.

125.    The counseling notes for the some 40 patients are virtually identical in content.  Based on the notes, each patient "mentioned boredom as a trigger for him using illicit substances"; they all reported "keeping busy his mind busy with watching shows on television and cleaning his living space."

126.    On March 31, 2020, Relator Quaresma was working at the Middletown, Rhode Island clinic location.  Despite the fact that M.D.'s counseling notes reflect that he provided 60 minutes of counseling to patients at other locations, M.D. spent the majority of the workday in a conference room

with D.C.

127.    Relator DelMonico saw several patients enter the counseling room at the Middletown, RI location on March 30, 2020.  The patients spent approximately five to ten minutes in the counseling room, yet the Journey falsely documented that they received 60 minutes of counseling and submitted claims to Medicaid for reimbursement based on 60-minute counseling sessions.

128.    On April 2, 2020, E.E., Health Home Team Coordinator, advised Relator Quaresma that M.D. had requested that she call certain patients on March 30, 2020, and on March 31, 2020 to conduct telehealth counseling.  When she looked at the patients' charts, E.E. discovered that counseling notes for these patients had already been written by M.D. and dated March 30, 2020, and March 31, 2020, despite the fact that he had not provided the counseling.  On April 10, 2020, E. E. was fired.

129.    On April 20, 2020, during one of the few times individual supervision was provided to Relator DelMonico, D.C. instructed Relator DelMonico to "fill in the gaps" and backdate treatment records for 54 patients that had only recently been assigned to Relator DelMonico.   In further contravention of state regulations, she instructed Relator DelMonico to do so without the patient present.  D.C. instructed Relator DelMonico to rely on whatever documentation existed in the patients' charts in order to prepare these falsified records.

130.    On April 20, 2020, D.C. sent Relator DelMonico a Treatment Plan review for patient number 17, who had been treated at the Middletown, RI clinic. The Treatment Plan review had been backdated to December 2019 and a Master Problem List that she prepared and provided to Relator DelMonico to add to the patient's chart. D.C. had never treated this patient. The Journey has been submitting weekly claims to Medicaid for methadone treatment services for this patient since June 12, 2018 to present.  D.C. also attached Treatment Plans for Middletown, RI patient numbers 18 and 5, both of which were backdated to January of 2020, prior to the time Relator DelMonico even worked at the

Middletown, RI clinic. D.C. instructed Relator DelMonico to sign these documents as the treating counselor. D.C. had not treated either of these patients. As to Patient number 18, no initial biopsychosocial assessment was performed; a backdated assessment was thereafter created; no treatment plan was created in 2018. The treatment plan was subsequently created and backdated. The treatment plan was signed by D.C. who was not employed at The Journey on the date set forth on the treatment plan. No proper treatment plan was created for 2019. Defendant nonetheless submitted weekly claims to Medicaid using CPT H0020 from June 15, 2018 to present. Despite the fact that this patient had been receiving methadone since June, 2018, no blood tests were done until May 15, 2019.

131.    On April 21, 2020, D.C. sent Relator DelMonico a Treatment Plan review for Middletown patient number 19. Again, D.C. prepared this document without having treated the patient and without the patient being present. She instructed Relator DelMonico to sign this document, despite the fact that Relator DelMonico had not treated this patient at the time. The Journey submitted weekly claims to Medicaid for methadone treatment services for this patient from November 29, 2018 to April 21, 2020.

132.    In mid-April, 2020, D.F., a Clinical Supervisor, instructed his staff to review patient charts back to 2017 and to create and backdate any missing documentation, which included missing Assessments, Treatment Plans and counseling notes. In that regard, staff were instructed to "fill in the gaps from 2017 onward."

133.    On April 29, 2020, when a counselor asked what date she should use in backdating documentation, D.F. asked her what date she started working at the Journey and stated "You should put the dates in based on when you started working here."

134.    On May 3, 2020, D.C. sent Relator DelMonico a Treatment Plan for Middletown, RI patient number 20, which she had backdated to September of 2019. Neither D.C. nor Relator DelMonico had treated this patient.

26

135.    On May 10, 2020, D.C. sent Relator DelMonico a Master Problem list and Treatment Plan for Middletown, RI patient number 21. She stated "I could not find the assessment in linked documents. I did the MPL [Master Problem List] based on Codac Assessments and other info we have now available." D.C. had never treated this patient.  Despite the fact that this patient has been receiving methadone since December, 2019, no biopsychosocial assessments have been conducted not have any treatment plans been performed.  Nevertheless, from December 20, 2019 to present, on a weekly basis, Defendants have been submitting claims to Medicaid under CPT H0020.

136.    In June, 2020, K.K., an administrator at the Journey, presented Assessments to Middletown, RI patients, numbers 22 and 23.   The patients were instructed to sign the Assessments.  After obtaining their signatures, J.R., Program Manager instructed K.K. to backdate the Assessments to January 1, 2020.  In fact, as to patient 22, no initial biopsychosocial assessment or treatment plan was performed. In 2019, a treatment plan review was purportedly conducted with no treatment plan.  The 2020 treatment plan, due in January, 2020 was not done until September 2020.  Nonetheless, The Journey has submitted weekly claims to Medicaid for methadone treatment under CPT Code H0020 since January 3, 2019.

137.    On August 5, 2020, S.K. proceeded to question each manager about their feelings toward The Journey.  C.V., who at that time had been promoted from Counselor to Clinical Supervisor of the Providence clinic, spoke up about the ongoing fraudulent practices at The Journey and about her fear that she could lose her job for speaking up.  C.V. also stated that she was afraid of losing her license and her career if the fraudulent billing practices continued.   During this meeting, M.D. admitted that The Journey was "not following all of the rules and regulations."

138.    On August 13, 2020, C.V. sent an email to Relator Quaresma with a list of the patient charts that had been selected to provide to SAMSHA at the August 26, 2020 audit.  They were charts for patient numbers 24 and 25**.**  The patient chart selection was subsequently changed to include patient numbers 11

and 26.  Patient number 11 involves one of the charts that Relator DelMonico had been instructed "to fix" in preparation for the previous state audit. In addition, as to patient number 11, no blood serology has been performed.  The Journey submitted weekly claims to Medicaid for patient number 11 for the period July 27, 2018 to December 31, 2019 and from May 1, 2020 to present.

139.    In October, 2020, a patient died. The patient had been receiving methadone at the Westerly, RI location since 2016.  The patient had not received any counseling services in April, 2018, June 2018, October, 2018, June 2019, November 2019.  In addition, counseling notes for December 13, 2017, January 4, 2018, February 20, 2018 and March 21, 2018 were left completely blank. Physical examinations in 2018 and 2020 were not performed.

**B.    Defendants Acted Knowingly and Orchestrated the Fraudulent Billing**

140.    Defendants know that their conduct is illegal.  Relator Quaresma and other staff have notified management of their objection to Defendants' unlawful billing practices and efforts to conceal the illegal conduct.

141.    Defendants have actively tried to conceal their conduct by systematically falsifying and backdating records to conceal services not delivered.

142.    Defendants have actively tried to conceal their conduct by altering treatment records sought by BHDDH and SAMSHA.

143.    Throughout their employment, Relators and other staff have objected to Defendants' unlawful conduct.

144.    Defendants are aware at all times that directors, supervisors and staff were creating false documents and placing these documents in patients' files.

145.    Defendants signed off on all of the fraudulently created documents.

146.    Defendants used the false treatment records created by the directors, supervisors and staff

to fraudulently obtain payment from Medicaid and Medicare.

147.    Relators assert that this practice is widespread among all of Defendants' clinic locations.

148.    Relator Quaresma worked at all of Defendants' clinic locations.  She received emails and heard numerous discussions amongst management, including D.C. and M.D. in which they discussed strategies for falsifying and backdating documents.

149.    Relator DelMonico was repeatedly instructed to falsify and back date treatment records by directors and supervisors, including by D.C. and M.D.

150.    From 2017 to present, Relators estimate that Defendants submitted claims to Medicaid and Medicare for services that were never delivered and in which patient charts were fraudulently created in at least seventy-five percent of the claims submitted by Defendants.

151.    Defendants engaged in these false and fraudulent practices in an effort to maximize profits at the expense of the Federal and Rhode Island State Medicaid programs and the Medicare program.

152.    As to each of the above factual allegations, Defendants have acted and continue to act with actual knowledge of the truth or falsity of this information, in deliberate ignorance of the truth or falsity of this information, and/or in reckless disregard of the truth or falsity of this information, Defendants knowingly violated the False Claims Act.

C.    **Retaliation Against Relator Quaresma**

153.    Beginning in or about early December, 2019, Relator Quaresma tried to stop and reported the Journey's false and fraudulent Medicaid billing practices described above to D.C., M.D., S.K and other Journey supervisors.

154.    In further attempt to stop the Journey's Medicaid false and fraudulent billing activity described above, Relator Quaresma provided D.C. and M.D. with written copies of the False Claims Act

("FCA"), in which she highlighted the relevant provisions of the FCA, including those which prohibit false Medicaid billing.

155.    In addition, because Relator Quaresma continued to identify a practice of false and fraudulent Medicaid billing, in or about January, 2020, Relator Quaresma delivered a training to all Journey staff regarding proper documentation and billing practices and violations of the False Claims Act.

156.    In or about February, 2020, K.G., Program Manager, sent an email to the Journey staff instructing them to document counseling and case management services that had not been provided to patients in order to bill Medicaid for these services.  In response, Relator Quaresma objected and notified D.C. and M.D. that this instruction constitutes fraud.

157.    In response to Relator Quaresma's reports and efforts to stop the false and fraudulent billing practices at the Journey, M.D. and D.C. repeatedly asked Relator Quaresma if she had reported the fraud to SAMHSA and the State of Rhode Island. S.K. admonished Relator Quaresma for having put her concerns about fraud in writing and instructed Relator Quaresma that she was only to report fraud verbally and only to her supervisors, M.D. or D.C.  S. K. made clear to Relator Quaresma that she was not to put her complaints of false and fraudulent billing at The Journey in writing.

158.    Defendants retaliated against Relator Quaresma for reporting and trying to stop the false and fraudulent Medicaid billing practices. The retaliation included but was not limited to the following: Relator Quaresma was subjected to intimidation and she was threatened with discipline and termination of her employment; she was discredited, isolated, ridiculed and disparaged; she was unfairly reprimanded; she was subjected to ongoing harassment and set up to fail, all leading up to and culminating in her constructive discharge on June 17, 2022.

159.    In mid-March, 2020, M.G., Program Manager,  at the Johnston, RI clinic, informed Relator Quaresma that The Journey was engaging in a pattern and practice of creating false documentation to

support services not actually provided to patients and that she was being pressured to "fix" patient charts by the Johnston, RI Clinical Supervisor.  Relator Quaresma urged M.G. not to do so.  A.V., Care Manager and C.V., Clinical Supervisor, were present.

160.    In mid-April, 2020, Relator Quaresma reported The Journey's fraudulent practices to BHDDH via their "QA Hotline". On April 21, 2020, Relator Quaresma spoke to K.B. at BHDDH and described the ongoing fraudulent practices occurring at The Journey, including the lack of treatment provided to patients and the false documentation that was created to hide the lack of services being billed to government payors.

161.    Relator Quaresma also reported to BHDDH the Journey's actions in falsifying treatment records in patient charts that had been provided to federal and state auditors, as well as the fraudulent case notes that were created and backdated to obtain reimbursement from Medicaid for services that were not, in fact, rendered.

162.    On April 27, 2020 and April 30, 2020, Relator Quaresma reported the fraud to BHDDH investigator D.B.  On May 1, 2020, Relator Quaresma provided a written statement to BHDDH and she also was in contact with E.M., Quality Assurance Supervisor at BHDDH.

163.    In May, 2020, when Relator Quaresma continued to identify instances of false and fraudulent Medicaid billing practices, in a continued effort to stop the fraudulent conduct, Relator Quaresma reported her concerns to Clinical Supervisor, D.D.  In response, D.D. advised Relator Quaresma that she had been instructed to create and backdate treatment plans by D.C. and M.D. Relator Quaresma urged D.D. not to do so and advised D.D. that the Journey's conduct in falsely creating and backdating treatment records in order to obtain Medicaid reimbursement is fraud.

164.    On May 8, 2020, Mr. Richardson, yelling loudly, advised D.C. that the state was again investigating The Journey and that the investigation was based on an employee complaint.

165.    On June 24, 2020, D.C. announced that The Journey hired a Corporate Compliance Officer, S.K., who is located in Indiana.  S.K. was tasked with facilitating manager meetings attended by Relator Quaresma.  S. K. repeatedly cautioned the attendees, including Relator Quaresma against "airing the Journey's dirty laundry".

166.    As the meetings continued, S.K. continued his efforts to uncover who at The Journey had made the reports to BHDDH.  S.K. proceeded to ask Relator Quaresma increasingly pointed questions as to whether she had reported the Journey's fraudulent billing and documentation practices to BHDDH.  He stated, "it will look worse for you than it will for us."

167.    On July 24, 2020, D.C. and M.D. directly accused Relator Quaresma of reporting the Journey's fraudulent billing practices to BHDDH and stated that they knew that Relator Quaresma was "going to the state."  D.C. accused Relator Quaresma of "wanting to bring down the Journey," while M.D. falsely accused Relator Quaresma of working for the State.   D.C. further informed Relator Quaresma that there were a lot of rumors that Relator Quaresma had reported The Journey to BHDDH and that Relator Quaresma was "dividing the team."

168.    On July 27, 2020, Mr. Richardson and A.B. questioned E.C., a Program Assistant about her knowledge of whether Relator Quaresma had "gone to the state" to report the Journey's fraudulent billing practices.

169.    During a meeting with S.K. on July 30, 2020 attended by Relator Quaresma, S.K. threatened that anyone who discloses to a third party The Journey's illegal "practices", will be implicating themselves in the misconduct.

170.    On October 5, 2020 as the retaliatory conduct directed at Relator Quaresma continued to escalate, and as it had become widely known that D.C. was looking to fire Relator Quaresma, Mr. Richardson called Relator Quaresma to meet with him on October 7, 2020.   At the meeting, Mr.

Richardson acknowledged that D.C. wanted to fire Ms. Quaresma because D.C. believed that Realtor Quaresma had reported The Journey's false and fraudulent billing practices to BHDDH.

171.    On or about October 7, 2020, in an apparent attempt to intimidate and threaten Relator Quaresma, Mr. Richardson advised Relator Quaresma that that he has close friends at BHDDH who were going to let him know the identity of the employee who reported The Journey's unlawful conduct to BHDDH and stated that he intended to terminate that employee's employment.

172.    On or about December 2, 2020, Mr. Richardson called Relator Quaresma to a meeting. In an attempt to further intimidate her, Mr. Richardson stated to Relator Quaresma that he had the ability to search employee email and threatened to take legal action against the employee who provided internal documents and emails to the government.

173.    On or about December 4, 2020, Relator Quaresma instructed L.W., Clinical Supervisor and M.A., Counselor, to not falsify treatment records, to not backdate treatment records and to not sign documents regarding treatment that, in fact, they had not provided.

174.    On or about December 11, 2020, E.C. advised Relator Quaresma that she had been interrogated by Mr. Richardson and A.B. regarding her knowledge of Relator's conduct in reporting the Journey's false and fraudulent Medicaid billing to the government.

175.    In January, 2021, without providing Relator Quaresma any further training, M.D. significantly increased Relator Quaresma's workload by assigning her the additional role of "Risk Manager".

176.    In February, 2021, Mr. Richardson advised Relator Quaresma that he "can't wait" to find out the identity of the whistleblower.

177.    On February 1, 2021, Relator Quaresma conducted an "incident chart review" involving a patient who had died. In doing so, Relator Quaresma discovered that the record was "missing"

documentation of treatment. Relator Quaresma reported this concern to management. Two days later, the "missing" documentation was apparently created, backdated and it was uploaded into the patient's chart. Thereafter, in an attempt to silence Relator Quaresma, M.D. reprimanded her, falsely claiming that the "missing" documentation was in the patient chart at the time that Relator Quaresma undertook her review on February 1, 2021.

178.  In late February, 2021, in an attempt to further intimidate Relator Quaresma, Mr. Richardson advised Relator Quaresma of his intention to read staff emails to confirm the identity of the employee who reported the Journey's fraudulent billing practices to the government.

179.  In March, 2021, without any experience or training in employee hiring or recruitment, M.D. further added to Relator Quaresma's job duties by requiring that she recruit and hire all new employees at all four (4) Journey locations.

180.  Shortly thereafter, Mr. Richardson unfairly reprimanded Relator Quaresma.

181.  In mid-March, 2021, M.D. called Relator Quaresma to a disciplinary meeting where she was reprimanded for having claimed that documentation was missing from the record when in fact, documentation was created and placed in the record two days after her review. M.D. continued to undermine Relator Quaresma and create discord between her and her staff.

181.  In about March, 2021, Relator Quaresma reported the ongoing retaliatory treatment she continued to endure to M.G., the Journey's Corporate Compliance Officer.

182.  In late April, 2021, Relator Quaresma continued to identify multiple instances in which the Journey was continuing to seek reimbursement for treatment that had not been delivered and treatment records that had been falsified and backdated, as described above.

183.  On about April 29, 2021, Relator Quaresma reported her concerns about the Journey's continuing false and fraudulent documentation and Medicaid billing practices to K.S., Clinical Supervisor

and Program Manager.

184.    On or about May 4, 2021, M.D. unfairly reprimanded Relator Quaresma, purportedly for the time it took her to complete billing sheets.

185.    On or about June 3, 2021, Mr. Richardson instructed Relator Quaresma to "resign immediately."

186.    On June 7, 2021, Relator Quaresma was advised that M.D. was telling the Journey staff that Relator Quaresma had reported the Journey's false and fraudulent billing practices to the government, calling Relator Quaresma the "puppet master."

187.    On June 8, 2021, Relator Quaresma advised M.G. that she could no longer withstand the Journey's conduct in continuing its fraudulent billing practices, the retaliatory treatment she was forced to endure and that she was left with no choice but to tender her resignation.

188.    On June 17, 2021, Relator Quaresma was forced to resign her employment at the Journey.

189.    Relator Quaresma's actions in reporting and efforts to stop violations of Medicaid billing requirements as set forth above are protected activities within the meaning of 31 U.S.C. §3730(h).

190.    Defendants were aware of Relator Quaresma's complaints and efforts to stop the illegal Medicaid billing outlined above.

191.    Relator Quaresma's complaints and efforts to stop the Medicaid billing practices of Defendants as forth above put Defendants on notice that Relator Quaresma's complaints could lead to a *qui tam* action.

192.    Defendants' actions in harassing and discriminating against Relator Quaresma in her work conditions were taken in retaliation for her efforts to stop and her reports of improper Medicaid billing practices by Defendant The Journey as set forth above and their resulting False Claims Act violations.

193.    As a direct result of Defendants' actions in retaliating against Relator Quaresma in

violation of 31 U.S.C. §3730(h), Relator Quaresma has suffered and continues to suffer damages in an amount to be determined at trial.

## COUNT I:  Knowingly Presenting False Claims
### (31 U.S.C. § 3729(a)(1) (2008), § 3729(a)(1)(A) (2009))

194.    Relators Quaresma and DelMonico re-allege and incorporate the allegations contained in paragraphs 1 through 193, as if fully set forth herein.  This Count is a civil action by Relators, acting on behalf of and in the name of the United States, against Defendants for violating 31 U.S.C. § 3729(a)(1)(A).

195.    Defendants have knowingly presented or caused to be presented false claims and/or false certifications for payment to officials or employees of the United States Government.

196.    Because of the Defendants' conduct under this Count, the United States has suffered actual damages.

## COUNT II:  False Statements or Records
### (31 U.S.C. § 3729(a)(1)(B) (2009))

197.    Relators Quaresma and DelMonico re-allege and incorporate the allegations contained in paragraphs 1 through 193 as if fully set forth herein.  This Count is a civil action by Relators, acting on behalf of and in the name of the United States, against Defendants for violating 31 U.S.C. § 3729(a)(1)(B)(2009).

198.    Defendants have knowingly made or used, or caused to be made or used, false statements for the purpose of getting false or fraudulent claims paid or approved by the Government.  Defendants have made or used these false statements, or caused them to be made or used, with the specific intent to get claims paid or approved by the United States Government. The false statements were material to the Government's decisions to make or approve payments on the false claims.

199.    Because of the Defendants' conduct under this Count, the United States has suffered actual damages.

### COUNT III:  Conspiracy
### (31 U.S.C. § 3729(a)(1)(C) (2009))

200.    Relators allege and incorporate the allegations contained in paragraphs 1 through 193 as if fully set forth herein.  This Count is a civil action by Relators, acting on behalf of and in the name of the United States, against Defendants for violating 31 U.S.C. § 3729(a)(1)(C).

201.    Defendants have conspired among themselves and/or with others to defraud the Government by getting false or fraudulent claims allowed or paid.

202.    Because of the Defendants' conduct set forth in this Count, the United States has suffered actual damages.

### COUNT IV:  Violation of "Reverse" False Claims Provision
### (31 U.S.C. § 3729(a)(1)(G) (2009))

203.    Relators Quaresma and DelMonico re-allege and incorporate the allegations contained in paragraphs 1 through 193 as if fully set forth herein.  This Count is a civil action by Relators, acting on behalf of and in the name of the United States, against Defendants for violating 31 U.S.C. § 3729(a)(1)(C)(2009).

204.    Defendants have knowingly concealed and knowingly and improperly avoided and decreased their obligations to pay or transmit money to the Government, including payments received from the Government for resulting from express or implied grantor-grantee or contractual relationships, from statute or regulations, or from the retention of any overpayment of funding received from Medicare and Medicaid and the government.  Because of Defendants' conduct, the United States has suffered actual damages.

### COUNT V:  Violation of "Whistleblower Retaliation" Provision
### of the False Claims Act – Quaresma
### (31 U.S.C. § 3730(h))

205.    Plaintiff Quaresma re-alleges and incorporates the allegations contained in paragraphs 1 through 193, as if fully set forth herein. This Count is a civil action by Plaintiff Quaresma against Defendants The Journey and Richardson for violating 31 U.S.C. § 3729(h), the "whistleblower retaliation" provision of the False Claims Act.

206.    During the course of her employment at The Journey, Plaintiff Quaresma engaged in lawful activities in furtherance of an action to be filed under the *qui tam* provisions of False Claims Act, and she engaged in other lawful efforts to stop Defendants from violating the False Claims Act ("protected conduct").

207.    Because Plaintiff Quaresma has been engaged in protected conduct, Defendants have retaliated against her, causing her to suffer damages.

### COUNT VI:  Violations of the Rhode Island False Claims Act
### (R.I.G.L. § 9-1.1-1 et seq. (2010))

208.    Relators Quaresma and DelMonico re-alleges Paragraphs 1 through 193, inclusive.

209.    The Rhode Island False Claims Act imposes liability upon, inter alia, those who knowingly present or cause to be presented false claims for payment or approval, and those who make or sue, or cause to made or used, false records or statement material to a false claim.

210.    Compliance with federal and state healthcare laws, is a material condition of payment of claims submitted to the Rhode Island Medicaid program.  R.I.G.L. §§40-8.2-3(a)(2), 40-8.2-5; Code of R.I. Rules § 15-040-08; R.I. Dept. of Human Services Code of Rules §§ 0300.40.15, 0300.40.20; State of R.I. Exec. Office of Health and Human Services Provider Agreement Form §§ 1, 15.

211.    To obtain reimbursement from Rhode Island's Medicaid and other healthcare programs, providers ware required to submit a provider enrollment agreement, pursuant to which the provider agrees

to: "follow all laws, rules, regulations, certification standards, policies and amendments including but not limited to the False Claims Act and HIPAA, that govern the Rhode Island Medicaid Program as specified by the Federal Government and the State of Rhode Island."

212.    Based on the foregoing allegations, the Defendants are liable under the Rhode Island False Claims Act, R.I. G. L. § 9-1.1-1 et seq. (2010).

### COUNT VII:  Violation of Rhode Island Whistleblowers' Protection Act – Quaresma (R.I.G.L. §§ 28-50-1 et seq.)

213.    Plaintiff Quaresma re-alleges and incorporate the allegations contained in paragraphs 1 through 193, as if fully set forth herein.  This Count is a civil action by Plaintiff Quaresma against Defendants The Journey and Richardson for violating the Rhode Island Whistleblowers' Protection Act, R.I.G.L. §§ 28-50-1 et seq.

214.    Defendants The Journey and Richardson, by their acts and/or omissions, including but not limited to those described herein, violated the Rhode Island Whistleblowers' Protection Act insofar as Defendants The Journey and Richardson have discriminated against her for opposing and reporting what she reasonably believed to be violations of law, rules, and/or regulations promulgated under federal and state law, causing her to suffer damages.

### PRAYER FOR RELIEF

Plaintiffs/Relators demands judgment against the Defendants as follows:

a.  That by reason of the violations of the False Claims Act, this Court enter judgment in favor of the United States and against Defendants, jointly and severally, in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of not less than Five Thousand Five Hundred Dollars ($5,500.00) and not more than Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729;

b.      That the Relators, as *qui tam* Plaintiffs, be awarded the maximum amount allowed pursuant

to Section 3730(d) of the False Claims Act or any other applicable provision of law;

      c.     That the Relators, as *qui tam* Plaintiffs, be awarded all costs of this action, including reasonable attorneys' fees and court costs, against the Defendants;

      d.     That Plaintiff Quaresma, as an individual Plaintiff, and in consequence of Defendants The Journey and Richardson's unlawful conduct directed at her in violation of 31 U.S.C. § 3730(h), be awarded all remedies afforded to her under that section, including two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of The Journey's and Richardson's misconduct, including litigation costs and reasonable attorneys' fees;

      e.     That Plaintiff Quaresma, as an individual Plaintiff, and in consequence of Defendants' unlawful conduct directed at her in violation of R.I.G.L. §§ 28-50-1 *et seq*., be awarded all remedies afforded to her under that statute;

      f.     That Plaintiffs/Relators have such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs/Relators demand that this matter be tried before a jury.

Respectfully submitted,

Plaintiffs/Relators, Sara Quaresma and
Michael DelMonico,
By Their Attorneys,
Herman Law Group

*/s/ Louise A. Herman*
Louise A. Herman, Esq. Bar No. 6430
1445 Wampanoag Trail, Suite 104
E. Providence, Rhode Island 02915
Phone: 401-277-4110
Fax: 401-433-0139
DATED:  May 26, 2023         Email: lherman@lhermanlaw.com

## <u>CERTIFICATION</u>

I hereby certify that on this 26th day of May, 2023, a true and accurate copy of the foregoing document, filed through the ECF system, will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

*/s/ Louise A. Herman*
Louise A. Herman