UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|   |   |
|---|---|
| THE UNITED STATES OF AMERICA and THE STATE OF RHODE ISLAND *ex rel.* SARA QUARESMA and MICHAEL DELMONICO, Plaintiffs/Relators, v. THE JOURNEY TO HOPE, HEALTH AND HEALING, INC. and KENNETH L. RICHARDSON, JR., Individually and in his Official Capacity, Defendants. | C.A. No. 20-451-JJM-LDA |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Chief Judge.

Before the Court are Defendant The Journey to Hope, Health and Healing, Inc. and Defendant Kenneth L. Richardson Jr.'s Motions to Dismiss under Fed. R. Civ. P. 12(b)(6). The United States and State of Rhode Island sued as intervenors under the False Claims Act ("FCA") and Rhode Island False Claims Act ("RIFCA"), alleging a multi-year scheme to defraud the Government by submitting false claims for methadone treatment. ECF No. 11. Former employees Sara Quaresma and Michael DelMonico ("Relators") sued for retaliation. ECF No. 20.

Defendants (collectively, "Journey to Hope") argue that the Government is improperly using the FCA to punish regulatory violations. Journey to Hope moves to dismiss all claims under Fed. R. Civ. P. 12(b)(6) on the grounds that no false claims

were submitted, and that the Complaint fails to meet the heightened pleading standard of Rule 9(b). Journey to Hope also moves to dismiss Counts V and VII of Relator's Amended Complaint on the grounds that reporting regulatory violations (unlike false billing) is not protected under the FCA.[1]

For the reasons below, the Court DENIES Journey to Hope's Motions to Dismiss as to all Plaintiffs. ECF Nos. 21 and 26.

I. **BACKGROUND**[2]

Journey to Hope is a company that provides substance use disorder treatment services at four clinic locations in Rhode Island. It is certified as an Opioid Treatment Program ("OTP"), enrolled as a Rhode Island Medicaid provider, and provides Medication Assisted Treatment ("MAT") including methadone. ECF No. 11 at 11.

Providers in the Rhode Island Medicaid Program sign agreements that require them to follow all "applicable provisions of federal and state laws" and to "[refrain] from billing for services which are not documented." *Id.* at 7. By submitting a claim, providers certify "that the goods or services listed were medically necessary . . . and

---

[1] The operative complaint is the Government's Complaint in Intervention (ECF No. 11), which now controls claims under 31 U.S.C. § 3729 *et seq.* and R.I. Gen. Laws § 9-1.1-1 *et seq.* ("FCA claims"). Relators' Amended Complaint (ECF No. 20) is limited to claims under 31 U.S.C. § 3730(h) and R.I. Gen. Laws § 28-50-1 *et seq.* ("retaliation claims"), which are brought in a personal capacity. The parties have stipulated to the dismissal of all other counts in the Relators' Amended Complaint, including retaliation claims against Kenneth L. Richardson, Jr. Journey to Hope has also withdrawn its Rule 15(a) challenge. ECF Nos. 32, 34.

[2] Plausible facts alleged in the Complaint are taken as true for purposes of deciding a motion to dismiss. *Gargano v. Liberty Int'l Underwriters, Inc.*, 572 F.3d. 45, 48 (1st Cir. 2009). The Government's facts are drawn from ECF No. 11, while Relators' facts are drawn from ECF No. 20.

actually rendered to the RI Medicaid beneficiary." *Id.* at 8. Because Journey to Hope is certified as an OTP and a Medicaid provider, it must adhere to heightened standards. It is required to create an "individualized, person-centered treatment plan for each patient, both initially and annually," conduct biannual review and revision of these plans, offer at least one hour of counseling per month (or every ninety days, if participating in group therapy),[3] and maintain clinical caseloads that do not exceed an average staff to client ratio of 1:60. *Id.* at 8-10.

Plaintiffs allege that Journey to Hope took on so many patients that it was "impossible" to meet the standard of care required of OTP programs. *Id.* at 14. They allege that Journey to Hope routinely failed to update patient records, record treatment plans, or offer required counseling. *Id.* at 24. Journey to Hope was aware of its deficiencies and took steps to "fix" patient files to prepare for state audits to maintain its accreditation. *Id.* at 15. Supervisors told employees to backdate treatment plans and counseling records and threatened employees with termination if they failed to comply. *Id.* at 13-18. Despite these known and apparently far-reaching shortfalls, from 2015 to 2021 Journey to Hope continued to bundle all its services and bill Rhode Island Medicaid using a code available to certified OTP providers. *Id.* at 11-12.

Relators Sara Quaresma and Michael DelMonico were previously employed by Journey to Hope. ECF No. 20 at 15. Ms. Quaresma raised her concerns directly to Journey to Hope supervisors, providing them copies of the FCA with the relevant

---

[3] This requirement was changed after the period at issue.

3

provisions highlighted. *Id.* at 29-30. She reported her concerns to the state through the "QA Hotline." *Id.* at 31. After this, her supervisors asked increasingly pointed questions of Ms. Quaresma to determine whether she had reported Journey to Hope for fraudulent practices and accused her being a whistleblower. *Id.* at 32. Ms. Quaresma was the subject of repeated reprimands and disciplinary actions and reported the retaliatory treatment she endured to Journey to Hope's Compliance Officer. *Id.* at 33-35. Three months later, Journey to Hope's CEO Mr. Richardson told Ms. Quaresma to resign. She did so soon after. *Id.*

## II.  STANDARD OF REVIEW

To survive a 12(b)(6) challenge, a complaint must contain facts sufficient to support a claim of relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must "accept as true all well-pleaded facts" and disregard all "conclusory legal allegations." *Gargano v. Liberty Int'l Underwriters, Inc.*, 572 F.3d 45, 48 (1st Cir. 2009); *Morales-Cruz v. Univ. of Puerto Rico*, 676 F.3d 220, 224 (1st Cir. 2012). It must draw on its "judicial experience and common sense" to determine whether the claim is plausible, that is, whether the "factual content . . . allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

Claims brought under the FCA and RIFCA are also subject to a heightened pleading standard under Fed. R. Civ. P. 9(b). *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 228 (1st Cir. 2004). Because a false claim is the "the *sine qua non* of a False Claims Act violation," the Complaint must provide the

"time, place, and content" of allegedly false representations, such as the content of the claims, the amount of money charged, specific goods or services that were billed to the Government, the individuals involved in the billing, and the time between the alleged fraud and the submission of claims. *Id.* at 225, 232-33 (citation and internal quotation marks omitted). There is "no checklist of mandatory requirements," (*see id.*), but a sufficient pleading under Rule 9(b) must "provide at least some identifying content" to apprise Defendants of the acts that form the basis for the claim. *United States ex rel. Carbon v. Care New Eng. Health Sys.*, 567 F. Supp. 3d 355, 359 (D.R.I. 2021).

## III.  DISCUSSION

The Government has brought two causes of action under the FCA: a presentment claim, and a false records claim. 31 U.S.C. § 3729(a)(1)(A)-(B).[4] To survive a 12(b)(6) motion, the Government must plausibly allege that Journey to Hope knowingly presented a false claim for payment (presentment), or that it knowingly made a false record or statement that was material to a false claim (false records). These are similar causes of action and are treated the same, except that one involves a claim, and the other involves a record. *United States v. Omnicare, Inc.*, No. 1:15-CV- 4179 (CM), 2021 WL 1063784, at *8 (S.D.N.Y. Mar. 19, 2021).

---

[4] Because RIFCA mirrors the FCA, the state claims may be treated analogously under this action. *New York v. Amgen Inc.*, 652 F.3d 103, 109 (1st Cir. 2011); *State ex rel. Harmeyer v. Shaw's Supermarkets, Inc.*, Nos. PC-2015-4895, PC-2015-4896, 2017 R.I. Super. LEXIS 90, at *11 (Super. Ct. May 1, 2017).

5

For liability to attach, the Government must prove that (1) there was a claim for payment (or record supporting such a claim); (2) that was false or fraudulent; and (3) the claim was submitted with knowledge of its truth or falsity. *United States ex rel. Berkley v. Ocean State, LLC*, No. CV 20-538-JJM-PAS, 2023 WL 3203641, at *2 (D.R.I. May 2, 2023) (citing *Karvelas*, 360 F.3d at 225). Additionally, the claim or record must be material. *U.S. ex rel. Loughren v. Unum Grp.*, 613 F.3d 300, 307 (1st Cir. 2010). "Knowingly" means having actual knowledge or acting in "deliberate ignorance" or "reckless disregard" of the truth or falsity of the information but requires "no proof of specific intent to defraud." 31 U.S.C § 3729(b)(1). "Material" means having "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

### A.     False Claims Act (ECF No. 11 Counts I-IV)

#### 1.     Elements of a False Claim

To state the obvious, liability only attaches under the FCA if the claims were "false." *Karvelas*, 360 F.3d at 232. "Without the *presentment* of [a false or fraudulent] claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the False Claims Act." *Id.* (citing *U.S. ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002)). The First Circuit takes "a broad view" of what may constitute a false claim or statement to avoid improperly foreclosing FCA liability and has rejected frameworks that turn on legal versus factual falsity. *U.S. ex rel. Jones v. Brigham & Women's Hosp.*, 678 F.3d 72, 85 (1st

6

Cir. 2012) (citation omitted). Liability is constrained by "strict enforcement of the Act's materiality and scienter requirements" rather than a sharp definition of falsity. *Id.* at 85-86 (citing *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 387-88 (1st Cir. 2011)) (internal quotation marks omitted).

Because the parties analyze falsity according to two different legal theories (factually false and legally false)—and because Journey to Hope relies on the Supreme Court's holding in *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 190 (2016) ("*Escobar II*"), which develops the legally false theory—the Court will briefly discuss these theories, recognizing that the First Circuit does not follow this approach. Under either method, the Court finds that Plaintiffs have plausibly alleged a false claim, that the misrepresentations were material, and that Defendants knew that the underlying regulatory violations were material to payment.

### a) Falsity

#### i. *Factually False*

A factually false claim is "untrue on its face." *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 154 (D.D.C. 2011). The Government alleges that Journey to Hope used the billing code H0020 ("Alcohol and/or drug services; methadone administration and/or service (1 unit per week)") to bill for counseling services and treatment plans that were required under Rhode Island law, but never provided.[5] ECF No. 28 at 21-24; ECF No. 28-4 at 3. Pointing to the phrase "and/or,"

---

[5] *See* 212 R.I. Code R. § 10-10-1.6.14 ("Medication Assisted Treatment") ("An initial person-centered plan shall be completed within the ninety (90) days of each person's admission to the OTP" and "shall be reviewed, revised, and updated every

7

Journey to Hope argues that it only ever administered methadone and never billed for methadone in a week that it did not administer it, so strictly speaking, there was no lie. ECF No. 21 at 17-19.

Under well-established canons of legal interpretation, the Court must avoid interpretations that would render a provision meaningless. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012). Likewise, the Court should not interpret a term in a way that would frustrate the document's overarching purpose. *Id.* at 63. Rhode Island's Rehabilitative Services Policy includes billing code H0020 on a list of "all covered services for Substance Abuse treatment and counseling" and states that methadone maintenance services are reimbursable "only when provided in accordance with a treatment plan."[6] ECF No. 28-4 at 2-3. If the Rhode Island Executive Office of Health and Human Services had intended methadone to be reimbursable on its own, it could have said so plainly in the Medicaid Provider Manual. ECF No. 28-4 at 2-3.

To the extent that the billing code is ambiguous, the Government provides a ready explanation: while methadone is dosed daily (and so would always be reflected on a weekly billing cycle), counseling is only required once a month, and treatment

---

six (6) months" and "[a] minimum of one (1) [rehabilitative counseling] session per month is required."). ECF No. 28-1 at 70.

[6] This policy is cited in the Government's briefs and is mirrored in the Complaint, which incorporates the underlying regulations. ECF No. 11 at 10, ¶ 45.

8

plans need only be updated twice annually. Necessarily, when billed over a month or a year, a subset of those claims would be factually false.[7] ECF No. 28 at 23.

This is a plausible explanation and meets the requirements of Rule 12(b)(6). *Gargano*, 572 F.3d at 48 (on a motion to dismiss, the Court must draw all reasonable inferences in favor of the Plaintiffs). The Government alleges that counseling and treatment plans were required "services" under the bundled code H0020 (ECF No. 11 at 9, ¶¶ 42-49) and that claims were routinely submitted under this code without counseling or treatment plans for many years. *Id.* at 13, 19, ¶¶ 64, 104-124. Substantively, these claims would be factually false under 31 U.S.C. § 3729(a)(1)(A).

### ii. *Legally False (Implied False Certification Theory)*

The Government also alleges that these claims were false under a theory of implied false certification. Implied false certification occurs when "a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements," such that the claim is "misleading with respect to the goods or services provided." *Escobar II*, 579 U.S. at 186-87. Liability may attach if Defendants (1) made specific representations about the goods or services provided; (2) while knowingly failing to disclose material violations that make those representations "misleading half-truths." *Id.* at 190. The underlying requirement need not be expressly designated as a condition of payment; it is enough

---

[7] *See Carbon*, 567 F. Supp. 3d at 360-61 (a plausible inference of falsity arises if a particular course of conduct would "necessarily" result in submitting a false claim).

9

that Defendants know that the violation was material to payment and submitted the claim anyway. *Id.* at 181.

*Escobar* involved a patient who died of a seizure after being treated by unlicensed providers who falsified their qualifications to obtain credentials for submitting Medicaid claims. *Id.* at 183-84. The First Circuit held that "[c]ompliance with the regulations at issue pertaining to staff supervision and core staffing . . . is a condition of payment by MassHealth" and that the Relators had adequately stated a claim by alleging that "supervision at Arbour was either grossly inadequate or entirely lacking." *United States v. Universal Health Servs., Inc.*, 780 F.3d 504, 514, 517 (1st Cir. 2015), *vacated and remanded*, 579 U.S. 176 (2016) ("*Escobar I*"). The Supreme Court granted cert to clarify the validity and scope of the implied false certification theory (*Escobar II*, 579 U.S. at 186) but otherwise upheld the First Circuit's reasoning. On remand, the First Circuit again found that the Government had plausibly alleged a false claim. *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 112 (1st Cir. 2016) ("*Escobar III*").

Under *Escobar II*, a false claim requires a specific representation about goods or services that is a "misleading half-truth" because of the underlying violations. The Government easily meets the first part of this test. The Complaint alleges that by using the billing code H0020, Journey to Hope specifically represented that it met the requirements to bill as an OTP and was providing required "services" including updated treatment plans and counseling. ECF No. 11 at 10-12, ¶¶ 47-53. Between January 2015 and July 2021, over half of the claims submitted under this code were

10

for patients without updated treatment plans in place, and the Government identifies three such patients for whom claims had been repeatedly billed under H0020 for several years. *Id.* at 19-21, 24, ¶¶ 104-124, 138.

Journey to Hope argues that there was no "misleading half-truth" because it did, in fact, administer methadone.[8] ECF No. 21 at 28-32. Borrowing the Supreme Court's analogy that it would be fraudulent for a supplier to knowingly sell the Government guns that do not shoot (*see Escobar II*, 579 U.S. at 191), Journey argues that "[b]illing for guns that cannot shoot . . . would be akin to The Journey billing for methadone that is expired, adulterated or counterfeit, such that it does not quell a recovering addict's impulse for oxycontin or fentanyl." ECF No. 21 at 24.

It strains credulity to credit this on the facts and reasoning of *Escobar III*, in which the First Circuit, on remand, found FCA liability based on staffing and accreditation violations very similar to the violations alleged here. The Government has plausibly alleged that treatment plans and counseling services were specifically required under the H0020 billing code. ECF No. 11 at 8-12, ¶¶ 37-53. To take the Supreme Court's analogy, if it would be a "misleading half-truth" to knowingly bill the Government for guns that don't shoot, it would be so to bill the Government for methadone administration without a valid treatment plan. 579 U.S. at 191. If

---

[8] As for counseling, Journey to Hope argues that under federal and state law, it was required to "offer" counseling, but not "provide it." ECF No. 21 at 28-32. The Government has offered many facts to the contrary, and on a motion to dismiss, the Court must take these well-pleaded facts as true.

treatment plans and monthly counseling are deemed to be "material" to payment, then these claims also would be false under a theory of implied false certification.

### b) Material

The crux of the analysis—under *Escobar II*, and in the First Circuit generally—is whether Journey to Hope knew that the underlying regulations were "material to the Government's payment decision." *Escobar II*, 579 U.S. at 192-93; *see also* 31 U.S.C § 3729(b)(4) (material means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property"). As Journey to Hope notes, the FCA is not a "vehicle for punishing garden-variety breaches of contract or regulatory violations." *Escobar II*, 579 U.S. at 194. The fundamental question is "whether a piece of information is sufficiently important to influence the behavior of the recipient." *Escobar III*, 842 F.3d at 110 (citation omitted).[9]

There is no question, given the facts alleged in the Complaint, that Journey's violations "went to the very essence of the bargain." *Escobar II*, 579 U.S. at 193 n.5. To wit:

- Journey to Hope was certified as an OTP by the Substance Abuse and Mental Health Services Administration and was required to have a current, valid accreditation to administer methadone. ECF No. 11 at 9, ¶¶ 38-41.

- Federal law required Journey to provide "adequate medical, counseling, vocational, educational, and other assessment and treatment services" as a condition of certification. *Id.* ¶¶ 42.

---

[9] This is a holistic analysis: it is relevant, but not dispositive, if a provision was identified as a condition of payment, or if Defendants know that the Government consistently refuses to pay claims where the condition is not met. *Escobar II*, 579 U.S. at 194-95. But if the Government regularly pays claims in full with knowledge of the violation, the provision would likely not be material. *Id.*

- Federal law required Journey to prepare an initial treatment plan for each patient, to update and review treatment plans, to provide "adequate substance abuse counseling," and to maintain a recordkeeping system for patient care. *Id.* at 9-10, ¶¶ 43-44.

- Rhode Island law required Journey to be licensed by the state, to prepare "an individualized, person-centered treatment plan for each patient, both initially and annually," and to "review, revise and update these plans every six months." *Id.* ¶¶ 41, 45.

- Rhode Island law required Journey to provide at least one hour of counseling per month (or every 90 days, if in group counseling) and to staff appropriately. *Id.* ¶¶ 45-46.

- The Provider Agreement required Journey to refrain from billing for undocumented services, and to certify by signature "that the goods or services listed were . . . actually rendered to the R.I. Medicaid beneficiary." *Id.* at 7-8, ¶ 35.

- Half of the claims submitted under billing code H0020 between January 2015 and July 2021 were alleged to be missing an updated treatment plan or counseling records, during which period Journey submitted tens of thousands of claims. *Id.* at 12-13, 24, ¶¶ 59-64, 138.

- Three patients cited in the Complaint had treatment plans that were either missing or years out of date, with hundreds of claims billed under the billing code H0020. *Id.* at 19-21, ¶¶ 104-124.

- Journey backdated treatment plans and fabricated counseling records in preparation for an audit, suggesting that it knew that these violations could affect its accreditation. *Id.* at 15-18, ¶¶ 77-100.

- Journey had been advised that without increasing its counseling staff, Rhode Island might not permit it to do new intakes, suggesting that it knew that these violations were material. *Id.* at 23, ¶ 135.

- The Complaint cites to internal emails asking "how we can do sessions without these important documents" (i.e., treatment plans) and stating that "many patients are positive fentanyl and

13

>> cocaine and no extra help given, no medical intervention . . . ." *Id.* at 23, ¶ 133.
>
> - A former supervisor testified under oath that "she was worried that as a result of Journey's conduct, people were going to die." *Id.* at 19, ¶ 103.

Journey to Hope's characterization of counseling and treatment plans as "ancillary" services simply does not hold water. Rhode Island state licensing regulations reference treatment plans more than forty times. ECF No. 28 at 23 (citing 212 R.I. Code R. § 10-10-1.1 *et seq.*). Counseling is referred to more than thirty times. *Id.* While no single factor is dispositive, compliance with requirements that are repeatedly referenced in absolute language is "the textbook example" of the type of representation that would be material to the Government's decision to pay claims. *Escobar III*, 842 F.3d at 111 (citing *Escobar II*, 579 U.S. at 193).

A survey of the regulations cited throughout the Complaint makes clear that treatment plans and counseling are central to MAT under Rhode Island law. *See* ECF No. 28-1, Ex. A. These violations are alleged to have continued for years, implicating tens of thousands of claims and causing real harm to patients. The Government may have been aware of staffing deficiencies, but nothing in the record suggests that it knew of the scope of the violations when it paid these claims. The Government has plausibly alleged that (1) regulatory compliance was a condition of payment; (2) treatment plans and counseling services were central to the regulatory scheme; and (3) the Government had no actual knowledge of the violations when it paid the claims. *Escobar III*, 842 F.3d at 110-11. Thus, the Government has alleged that these violations were material to its willingness to pay.

Case 1:20-cv-00451-JJM-LDA   Document 35   Filed 03/29/24   Page 15 of 19 PageID #: 679

### c) Scienter

Taking the well-pleaded allegations as true, the Government has overwhelmingly shown that Journey to Hope had actual knowledge that the violations were material to payment. *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749-50 (2023) (scienter refers to Defendants' knowledge and subjective beliefs, and can be established through "actual knowledge, deliberate ignorance, or recklessness") (citing 31 U.S.C. § 3729(b)(1)(A)). The Government cites testimony by former counselors at three locations who were asked to lie about fabricating counseling records (ECF No. 11 at 14-15, ¶¶ 73-76) and details an elaborate scheme to backdate and "fix" treatment plans and counseling records to prepare for an audit (*Id.* at 15-18, 22-24, ¶¶ 77-100, 125-137). Put simply, if Journey to Hope did not believe that its regulatory violations were material to payment, it would not have gone to such lengths to cover them up.

### 2. Rule 9(b): Pleading Fraud

The Government has alleged fraud with particularity under Rule 9(b), pointing to three instances in which claims were submitted on behalf of patients where the treatment plan either never existed, was years out of date, or was backdated and unsigned by a Journey employee.[10] ECF No. 11 at 19-21, ¶¶ 104-124.

---

[10] The Government cites records from four patients but declines to state whether any claims for payment were submitted for Patient 743. Because these allegations are not directly linked to fraudulent claims, the Court disregards them. *Hagerty ex rel. United States v. Cyberonics, Inc.*, 844 F.3d 26, 31 (1st Cir. 2016).

These allegations are specific as to time, place, and content. Patient 1180 was a patient at the Johnston location who entered the program in 2017, had no treatment plan on file, and had 241 claims submitted for bundled MAT services under the billing code H0020 between 2017 and 2021 for a total of $18,146.90. *Id.* at 19, ¶¶ 104-106. Patient 1167 was enrolled at the Providence location in 2014, had no changes made to their treatment plan for the next four years, and had 229 claims submitted under H0020 during this period for a total of $18,075.50. *Id.* at 20-21, ¶¶ 116-120. Patient 1618 was a patient at the Providence location from 2016 to 2022, had an initial treatment plan created in 2020, does not appear to have been present at the location until 2022, and had 281 claims submitted under H0020 between 2016 and 2021 for a total of $23,663.80. *Id.* at 21, ¶¶ 121-124.

These are specific instances of the Government's overarching complaint: that between 2015 and 2021, a statistically valid random sample showed that half of the claims submitted to Medicaid under billing code H0020 were for patients without updated treatment plans or counseling records. *Id.* at 24, ¶ 138. These examples are supported by extensive testimony from former employees stating that they were asked to fabricate these records. *Id.* at 14-18, ¶¶ 69-100. Taken together, the Court finds that the Complaint has alleged fraud with particularity.[11]

---

[11] The Court also finds that Relators' Original Complaint is sufficient under Rule 9(b) because it highlights specific instances where Medicaid claims were filed under billing code H0020 for patients whose records had been falsified. ECF No. 2 at 25, 27-30, ¶¶ 118, 127, 130-31, 135-36, 138. Thus, the Court declines Journey's invitation to dismiss Relators from the case. ECF No. 26 at 36-37.

### 3. Conclusion

For the reasons stated above, the Court finds that the Government has plausibly alleged that Journey to Hope knowingly presented, or caused to be presented, a false claim for payment under 31 U.S.C. § 3729(a)(1)(A). The Court also finds that the Government has plausibly alleged a claim for false records under 31 U.S.C. § 3729(a)(1)(B) because it alleges that treatment plans and counseling records were fabricated for the purposes of maintaining accreditation, which was required to submit claims under H0020. ECF No. 11 at 15-18, 22-24, ¶¶ 77-100, 125-137.

### B. Equitable Claims (ECF No. 11 Counts V-VI)

The Government also alleges payment by mistake and unjust enrichment, which are commonly brought alongside FCA claims and rely on the same facts. *Omnicare*, 2021 WL 1063784, at *13; *U.S. ex rel. Heesch v. Diagnostic Physicians Grp., P.C.*, CIV.A. 11-0364-KD-B, 2014 WL 2154241, at *11 (S.D. Ala. May 22, 2014). To plead unjust enrichment, a plaintiff must allege that (1) a benefit was conferred; (2) Defendants knew about the benefit; and (3) Defendants accepted the benefit in a way that would be inequitable for them to retain it without paying. *Burt v. Bd. of Trustees of Univ. of Rhode Island*, 523 F. Supp. 3d 214, 224-25 (D.R.I. 2021), *aff'd*, 84 F.4th 42 (1st Cir. 2023). To plead payment by mistake, a plaintiff must show that the Government "made . . . payments under an erroneous belief which was material to the decision to pay." *United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970) (citing *United States v. Wurts*, 303 U.S. 414, 415-16 (1938)). At common law, the

Government has "broad power to recover monies wrongly paid from the Treasury." *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 15 (1st Cir. 2005) (citing same).

Because the Court finds that the fraud claims are sufficiently pleaded, these claims survive as well. The Government has plausibly alleged that the United States and Rhode Island paid Journey to Hope "with the mistaken understanding that the Defendants had met all the OTP requirements . . . when in fact, such requirements were not met . . . ." ECF No. 11 at 31, ¶ 182. It has further alleged that Journey to Hope knowingly billed Medicaid and accepted payments for years based on treatment and counseling services that were never provided. *Supra Part A.* The same facts that support the sufficiency of the Government's FCA claims support the sufficiency of these equitable claims. These claims thus survive a motion to dismiss.

### C. Retaliation (ECF No. 20 Counts V and VII)

"To prevail on a False Claims Act retaliation claim, a plaintiff must show that 1) the employee's conduct was protected under the FCA; 2) the employer knew that the employee was engaged in such conduct; and 3) the employer discharged or discriminated against the employee because of his or her protected conduct." *Karvelas*, 360 F.3d at 235. Protected action means "acts done in furtherance of" an FCA action. 31 U.S.C. § 3730(h). A retaliation claim is not a "direct" claim and need not meet the Rule 9(b) standard for pleading fraud, nor must the Relators prove the actual submission of a false claim. *Guilfoile v. Shields*, 913 F.3d 178, 189 (1st Cir. 2019). Relators need only allege that retaliation was based on "conduct that reasonably could lead to an FCA action based on the submission of a false claim." *Id.*

The Court has already found that the operative Complaint plausibly alleges fraud and there is no question that Ms. Quaresma was engaged in FCA-related activity. She brought attention to deficient recordkeeping, provided Journey to Hope with copies of the relevant FCA provisions, and advised her supervisors that backdating records "in order to bill Medicaid for these services" constitutes fraud. ECF No. 20 at 29-30, ¶¶ 153-56. She alleges that her supervisors accused her of reporting fraudulent billing practices and said that they "knew" she was "going to the state." *Id.* at 32, ¶ 167-68. She points to a pattern of increased disciplinary actions, expanded job duties, and professional vitriol that began after Defendants started to suspect she was engaged in protected behavior. *Id.* at 32-35, ¶¶ 170-184. And she alleges that following this conduct, she was forced to resign. *Id.* at 35, ¶¶ 185-88.

Ms. Quaresma has sufficiently pled facts to establish her retaliation and whistleblower claims. These claims survive a motion to dismiss.

## IV.   CONCLUSION

For these reasons, the Court DENIES Journey to Hope's Motion to Dismiss as to all Plaintiffs. ECF Nos. 21 and 26.

IT IS SO ORDERED.

John J. McConnell, Jr.
Chief Judge
United States District Court

March 29, 2024